UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN SIMMONS; | ) | |
| DAVID MARSTERS, | ) | |
| by his next friend, Nancy Pomerleau; | ) | |
| LORRAINE SIMPSON, by her guardian, Sara Spooner; | ) | |
| SHERRI CURRIN, by her guardian, Sara Spooner; | ) | |
| CAROLE CHOJNACKI, by her guardian, Sara Spooner; | ) | |
| RICHARD CAOUETTE, by his guardian, Sara Spooner; | ) | |
| DONALD GRANT, by his guardian, Sara Spooner, | ) | |
| on behalf of themselves | ) | |
| and other similarly situated persons; and | ) | |
| MASSACHUSETTS  SENIOR ACTION COUNCIL, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. |
| | ) | 22-11715 |
| v. | ) | |
| | ) | |
| CHARLES D. BAKER, in his official capacity | ) | |
| as Governor of the Commonwealth of Massachusetts; | ) | |
| MARYLOU SUDDERS, in her official capacity | ) | |
| as Secretary, Executive Office of Health and | ) | |
| Human Services; | ) | |
| MICHAEL J. HEFFERNAN, in his official  capacity | ) | |
| as Secretary of the Executive Office of Administration | ) | |
| and Finance; | ) | |
| ELIZABETH CHEN, in her official capacity as | ) | |
| Secretary, Executive Office of Elder Affairs; | ) | |
| and AMANDA CASSEL KRAFT, in her official capacity | ) | |
| as Assistant Secretary of MassHealth, | ) | |
| | ) | |
| Defendants. | ) | |

**CLASS ACTION COMPLAINT**

# I.     INTRODUCTION

1.     John Simmons, David Marsters, Lorraine Simpson, Sherri Currin, Carole

Chojnacki, Richard Caouette, and Donald Grant are persons with disabilities, including older

adults with disabilities, who are languishing and often deteriorating in segregated nursing

facilities when they could be thriving in integrated community settings.  Each prefers to reside in

a more integrated residential setting, where they can live more independently, be closer to family and friends, and participate in community activities.  Federal law, including the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973 (Section 504), provides that they be given the opportunity to reside in such settings: "the unjustified segregation of disabled individuals in institutions is a form of disability discrimination barred by federal law." *Brown v. District of Columbia*, 928 F.3d 1070, 1072 (D.C. Cir. 2019).  Yet these individuals, and thousands of other similarly situated persons with disabilities, including members of Massachusetts Senior Action Council, are needlessly and illegally institutionalized and segregated in nursing facilities in Massachusetts. The individual plaintiffs and similarly situated persons with disabilities qualify for the defendants' system of Home and Community Based Services (HCBS), which provides residential and other support services in the community, but that system fails to provide adequate and appropriate residential services to all qualified persons.

2. Nursing facilities are segregated residential settings.  Unnecessary segregation in nursing facilities is also dangerous.  Living in segregated facilities has been linked to accelerated mental, emotional, and physical decline.  Further, over the past two and a half years during the COVID-19 pandemic, persons with disabilities in nursing facilities have suffered unique deprivations, including a serious risk of harm and death, and for a significant time were deprived of almost all contact with loved ones and friends.  They died at an alarming rate: one in every seven residents of nursing facilities in Massachusetts succumbed in the COVID-19 pandemic, which is one of the highest mortality rates in the country.  At one point, nearly 66% of all deaths in Massachusetts involved persons with disabilities who lived in nursing facilities and other

segregated long-term care settings.  In just the first six months of the pandemic, over 6,400 Massachusetts residents died in long-term institutions like nursing facilities.

3.    COVID-19 has highlighted the inequities in healthcare and the limited choices low-income people of color have regarding long-term care.  As a result, they are more likely to live in low-performing and under-resourced nursing facilities.  Nursing facilities with higher numbers of non-white residents have experienced higher levels of death from COVID-19.

4.    Being institutionalized in a nursing facility has long resulted in the denial of basic rights and other deprivations, including segregation, congregation, and isolation.  Many of the individual plaintiffs have spent years in these institutions, isolated from their families and friends.  During the COVID-19 pandemic, this isolation has at times become complete deprivation of face-to-face contact with the world outside of the institution.

5.    People with disabilities in nursing facilities are routinely subjected to a regimen often dictated by the needs of the institutions, with little to no control over basic choices, such as when to eat, when to go to bed, or what to do during the day.  They rarely or never leave the nursing facility to return to their homes and communities, and almost never attend social, recreational, and religious activities of their choosing outside of the facility.

6.    The hardships of institutionalization are most acutely felt by people of color, who fare poorly in nursing facilities compared to white residents.  For example, Black residents experience increased physical restraints, indwelling catheters, and psychotropic medications as compared to white residents. Similarly, they are more likely to have untreated or undertreated pain.

7.    Overall, persons with disabilities live restricted and often lonely lives in nursing facilities in order to access the Medicaid-funded services they need, even though the defendants

could, and must, provide the same or comparable residential and support services to them in integrated settings in the community.

8.      Virtually all the nursing and support services provided in a nursing facility can be provided in the community through the Commonwealth's HCBS programs.  In fact, persons eligible for these waiver programs must need the level of care provided in nursing facilities.

9.      Notably, as a result of prior litigation settlements, the defendants use Medicaid funding to promptly provide needed residential services and support to other populations, including persons with intellectual or developmental disabilities (IDD) or acquired brain injuries (ABI).  In other words, the Commonwealth knows how to provide appropriate remedies for its illegal segregation of people with disabilities and has done so successfully for residents with IDD and ABI.  It also knows how to provide information, opportunities, and meaningful choice about whether to remain in a segregated nursing facility, since it does so for persons with IDD and ABI.  And it knows how to provide effective screening, evaluation, service planning, specialized services, and case management, since it does so for persons with IDD.  Its systematic failure to do so for persons with other disabilities in nursing facilities leaves thousands of these persons unnecessarily institutionalized in nursing facilities, in violation of the ADA, Section 504, and the Medicaid Act.

10.     These few opportunities to transition to the community for the thousands of Medicaid-eligible people in nursing facilities means that qualified individuals who need residential services and supports must wait years, if not decades, to leave nursing facilities, and some never get to leave at all.  Thus, as a direct result of the defendants' actions and inactions, individuals with disabilities are experiencing or will experience unnecessary and prolonged

institutionalization in nursing facilities, due to the lack of sufficient community residential

services and supports that would allow them to live in the most integrated setting.

11.     The defendants also fail to offer a meaningful and effective process to allow

persons with disabilities to make an informed choice whether to remain in or leave a segregated

nursing facility.  The defendants fail to regularly provide relevant information to people with

disabilities in nursing facilities about community residential programs; present no opportunity to

explore and visit community residential options or engage in meaningful community activities;

make no systematic efforts to address barriers to transition; offer no accommodations for the

impact of the person's disability on decisions concerning where to receive services; and provide

no method for ensuring that they can make an informed choice about whether to remain in a

segregated nursing facility.  Similarly, there is no case management entity that is responsible for

planning and coordinating residential services that would allow persons with disabilities to

transition to community residential services.

12.     The unnecessary segregation and isolation of persons with disabilities stems

directly from the defendants' failure to meet their requirements under federal law.  The

inadequacies of the defendants' long-term care system include: (1) the failure to provide or fund

community residential services and supports necessary to meet the diverse needs of persons with

disabilities in nursing facilities; (2) the failure to adequately inform persons with disabilities of

HCBS options, including culturally competent[1] residential services and supports; (3) the failure

to engage with persons with disabilities and accommodate their disabilities to ensure that they

can make informed choices about whether to remain in a segregated nursing facility or live in an

_____

[1]  Throughout this Complaint, "culturally competent" in the context of services means services
that are effective, equitable, understandable, respectful, and responsive to diverse cultural health
beliefs and practices, preferred languages, health literacy, and other communication needs.

integrated community setting; and (4) the lack of case management services that could facilitate the transition of persons with disabilities from nursing facilities to residences in the community.

13.     The plaintiffs seek declaratory and injunctive relief to require the defendants to provide or fund timely, culturally competent, and appropriate community residential services and supports that would enable them to transition from segregated nursing facilities to more integrated community living arrangements, as required by the ADA, Section 504, and the Medicaid Act.  Individuals with Serious Mental Illness (SMI) seek additional declaratory and injunctive relief requiring the defendants to comply with the Pre-Admission Screening and Resident Review (PASRR) requirements of the Medicaid Act, including the provision of specialized services and active treatment to them while residing in nursing facilities.

## II.     JURISDICTION AND VENUE

14.     This action is authorized by 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights, privileges, and immunities guaranteed by federal laws and the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3), and 1343(4).

15.     This action is also brought pursuant to Title II of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  The defendants are public entities subject to Title II of the ADA, and receive federal financial assistance for, among other things, their Medicaid program, which in significant part funds the defendants' long-term care system, including nursing facility services and community services and supports.  This Court has jurisdiction over the claims under the ADA and Section 504 pursuant to 42 U.S.C. § 12133 and 29 U.S.C. § 794a.

16.     Plaintiffs' request for declaratory relief is brought pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.  Injunctive relief is authorized by 28 U.S.C. § 2202, 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure.

17.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b).

III.    **PARTIES**

        A.    *Individual Plaintiffs*

18.     John Simmons is a 73-year-old Black man with various medical conditions and serious mental illness.  He is a Medicaid recipient and has resided for more than 60 days at the Rehabilitation & Nursing Center at Everett, 289 Elm Street, Everett, Massachusetts.

19.     David Marsters is a 72-year-old white man with various physical disabilities and autism spectrum disorder.  He is a Medicaid recipient and has resided for more than 60 days at Hillcrest Commons, 169 Valentine Road, Pittsfield, Massachusetts.  He brings this action through his sister and next friend, Nancy Pomerleau.

20.     Lorraine Simpson is a 63-year-old Jamaican Black woman who has diabetes and a serious mental illness.  She is a Medicaid recipient and has resided for more than 60 days at Hermitage HealthCare, 383 Mill Street, Worcester, Massachusetts.  She brings this action through her court-appointed guardian, Sara Spooner, 482 Southbridge Street, Auburn, Massachusetts.

21.     Sherri Currin is a 54-year-old white woman who has multiple sclerosis and a serious mental illness.  She is a Medicaid recipient and has resided for more than 60 days at the Marlboro Hills Rehabilitation and Health Care Center, 121 Northboro Road, Marlborough, Massachusetts.  She brings this action through her court-appointed guardian, Sara Spooner.

22.     Carole Chojnacki is a 67-year-old white woman with various medical conditions and a serious mental illness.  She is a Medicaid recipient and has resided for more than 60 days in the Rehabilitation and Nursing Center at Everett, 289 Elm Street, Everett, Massachusetts.  She brings this action through her court-appointed guardian, Sara Spooner.

23.     Richard Caouette is a 63-year-old white man with various medical conditions and a serious mental illness.  He is a Medicaid recipient and has resided for more than 60 days at Bear Mountain Healthcare and Rehabilitation Center, 59 Action Street, Worcester, Massachusetts.  He brings this action through his court-appointed guardian, Sara Spooner.

24.     Donald Grant is a 63-year-old white man with various physical disabilities and a serious mental illness.  He is a Medicaid recipient and has resided for more than 60 days at the Worcester Rehabilitation Facility, 119 Providence Street, Worcester, Massachusetts.  He brings this action through his court-appointed guardian, Sara Spooner.

        *B.      Organizational Plaintiff*

25.     Massachusetts Senior Action Council (MSAC) is a state-wide, grassroots, senior-led organization comprised of older adults throughout the state.  Members of MSAC and its various chapters include older adults with disabilities who reside in nursing facilities and desire to return to more integrated settings in their homes and communities, but who are unable to do so because of the defendants' failure to provide them with appropriate community residential services and supports.

26.      MSAC is dedicated to ensuring that long-term care is delivered in the most integrated setting possible.  It empowers its members to use their own voices to address key public policy and community issues that affect their health and well-being.  MSAC's members represent a diverse cross-section of Massachusetts' older adult community, working together to

eradicate health disparities in communities of color and advocating for community-driven and community-centric solutions.  MSAC has spent, and continues to spend, considerable resources advocating for reforms in the Commonwealth's long-term care system, for expansion of community options needed to allow people with disabilities to live in integrated community settings, and for racial and health equity in the provision of community supports.

27.     MSAC brings this action on its own behalf and on behalf of its members who are directly affected by the defendants' actions and inactions.

C.     *Defendants*

28.     Charles D. Baker is the Governor of the Commonwealth of Massachusetts.  He is responsible for directing, supervising, and expending legislative appropriations for the executive departments of state government, including the Executive Office of Health and Human Services (EOHHS), the Executive Office of Administration and Finance (EOAF), and the Executive Office of Elder Affairs (EOEA).  He is also responsible for seeking, allocating, reallocating, expending, and monitoring funds from the legislature to implement the programs and deliver the services of those executive agencies, including all EOHHS programs for persons with disabilities, such as its waiver programs and other programs those departments operate.  The Governor appoints the Secretaries of EOHHS, EOAF, and EOEA and approves the appointments of other personnel at relevant departments and agencies, including MassHealth, which is the division of EOHHS that directly administers the Commonwealth's Medicaid program.  The Governor also is responsible for approving and ensuring the implementation of key disability policy and long-term care policies of the Commonwealth, including compliance with the ADA and other federal laws.  Governor Baker is sued in his official capacity.

9

29.     Marylou Sudders is the Secretary of EOHHS and is responsible for the oversight, supervision, and administration of each of the departments within EOHHS, including EOEA, the Department of Mental Health (DMH), the Department of Public Health (DPH), the Department of Disability Services (DDS), the Massachusetts Rehabilitation Commission (MRC), and MassHealth.  EOHHS is the Single State Agency in the Commonwealth responsible for complying with the Medicaid Act, including requesting, spending, and accounting for the Commonwealth's use of Federal Financial Participation (FFP) under the Act.  Secretary Sudders is responsible for the supervision, direction, and oversight of the Commonwealth's Medicaid program, including all mandatory and optional Medicaid services, including HCBS waiver programs and other services designed to enable individuals with disabilities in nursing facilities to transition to community settings, and for persons with SMI, to receive specialized services and active treatment.  She is sued in her official capacity.

30.     Michael J. Heffernan is the Secretary of the EOAF and is responsible for seeking, allocating, and approving the expenditure of adequate funds from the legislature to comply with the requirements of the Medicaid program and federal law.  He is sued in his official capacity.

31.     Elizabeth Chen, Ph.D., is the Secretary of the EOEA, an agency under the administrative authority of EOHHS.  Secretary Chen is responsible for planning, administering, and overseeing all services for older adults, and for "administering and coordinating a comprehensive system of long-term care benefits and services for elderly persons, including institutional, home-based and community-based care and services."  Mass. Gen. Laws ch. 19A, § 1.  EOEA is directly responsible for the day-to-day operation of the Frail Elder Waiver and the Aging Service Access Points (ASAPs), which is a program designed by statute to provide

information and referral, pre-admission screening, and care coordination to older adults.  She is sued in her official capacity.

32.     Amanda Cassel Kraft is the Assistant Secretary of MassHealth. MassHealth is the division of EOHHS that operates the Commonwealth's Medicaid program.  Ms. Kraft oversees the development and execution of the Massachusetts Medicaid Plan and waiver programs, including all Medicaid policies, procedures, contracts, and practices.  As Assistant Secretary for MassHealth, Ms. Kraft is responsible for ensuring that appropriate residential and support services are provided to nursing facility residents seeking to leave their facilities and return to their communities, as well as those residents with SMI in need of specialized services and active treatment.  She is sued in her official capacity.

## IV.    CLASS ACTION ALLEGATIONS

33.     Pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the individual plaintiffs bring this action on behalf of the following class: All Medicaid-eligible persons with disabilities in the Commonwealth who have resided or will reside in a nursing facility for at least 60 days, meet the qualifications for the Commonwealth's HCBS community programs, and need access to appropriate community residential services and supports[2] to live in integrated settings in the community.

---

[2]  The term "residential services and supports" means services that include provider-operated homes in the community plus an array of support services necessary to allow individuals with complex needs in nursing facilities to live in integrated settings in the community.  These residential services and supports currently are provided by EOHHS through its Moving Forward Residential Waiver program.  *See* Sec.V.D., *infra*.  For some persons with disabilities in nursing facilities who do not need this level of assistance, but do need an affordable and accessible residential setting, residential services and supports include a housing subsidy for an accessible and affordable living unit and a service coordinator/case manager who locates and arranges the housing unit.  This type of residential services and supports currently is provided by EOHHS through its Moving Forward Community Living Waiver program, as well as through DMH's supported housing programs.  *Id.*  Both waiver programs and DMH's programs have a fixed

34.     The individual plaintiffs also bring additional Medicaid claims on behalf of the following subclass (referenced herein as the "PASRR subclass"): All Medicaid-eligible persons with serious mental illness who have been admitted to, or who should be screened for admission to, nursing facilities pursuant to 42 U.S.C. § 1396r(e)(7) and 42 C.F.R. § 483.112.

35.     The size of the class is so numerous that joinder of all members is impracticable. There are approximately 22,000 adults with disabilities institutionalized in Massachusetts nursing facilities.  Joinder is also impracticable because the class is dynamic, and its members lack the knowledge and financial means to maintain individual actions.

36.     The size of the PASRR subclass is so numerous that joinder of all members is impracticable.  There are at least 1,500 individuals with SMI residing in nursing facilities across the Commonwealth.  Joinder is also impracticable because the PASRR subclass is dynamic, and its members lack the knowledge and financial means to maintain individual actions.

37.     There are questions of fact common to the class, including *inter alia*:

a.     Whether the defendants' planning, funding, and administration of its long-term care system for persons with disabilities fail to provide residential services and supports in the most integrated setting, resulting in the unnecessary institutionalization of persons with disabilities in nursing facilities;

b.     Whether the defendants' policies, procedures, and practices for its long-term care system result in the unnecessary institutionalization of persons with disabilities in nursing facilities;

---

capacity, which is woefully inadequate to allow all qualified persons with disabilities in nursing facilities to live in integrated settings in the community.

c.      Whether the defendants' residential services and support options for

persons with disabilities are inadequate to allow all persons with disabilities in

nursing facilities who are qualified for community residential services and

supports to transition to integrated residential settings in the community in a

timely manner;

d.      Whether the defendants fail to effectively provide persons with disabilities

in nursing facilities with sufficient and culturally competent information,

opportunities, and accommodations to allow all persons with disabilities to make

an informed choice whether to remain in a segregated institution or move to

integrated residential settings in the community;

e.      Whether the defendants fail to provide persons with disabilities in nursing

facilities with medically necessary case management that plans, coordinates, and

assists in obtaining appropriate community residential services and supports that

would allow them to live in culturally competent integrated residential settings in

the community; and

f.      Whether the defendants fail to provide equitable access to community

residential services and supports to persons with disabilities in nursing facilities.

38.     There are questions of law common to the class, including *inter alia*:

a.      Whether the defendants are violating the ADA and Section 504 by

planning, funding, and administering their long-term care system in a manner that

requires persons with disabilities to live in nursing facilities in order to receive

necessary residential services and supports;

b.     Whether the defendants are violating the ADA and Section 504 by: (i) failing to offer and provide community residential services and supports to nursing facility residents with disabilities that would enable them to live in the most integrated setting appropriate to their needs; and (ii) utilizing eligibility criteria and methods of administration that have the effect of excluding individuals with disabilities from accessing the community residential services and supports they need to reside in integrated, community residential settings;

c.     Whether the defendants are violating the ADA and Section 504 by planning, funding, and administering their long-term care system in a way that discriminates against persons with disabilities;

d.     Whether the defendants' failure to provide persons with disabilities in nursing facilities with timely access to community residential services and supports that would allow them to transition to the community, and their failure to provide timely services for persons with disabilities enrolled in a HCBS waiver program, violates the reasonable promptness provisions of the Medicaid Act;

e.     Whether the defendants' failure to provide persons with disabilities with information sufficient to allow them to make an informed choice of whether to enter or remain in a nursing facility violates the freedom of choice provision of the Medicaid Act; and

f.     Whether the defendants' administration of the freedom of choice provisions of the Medicaid Act, without providing nursing facility residents with reasonable accommodations in the choice process, violates the Medicaid Act.

39.     There are questions of fact common to the PASRR subclass, including *inter alia*:

a.      Whether the defendants fail to accurately screen and identify persons with a diagnosis of SMI prior to or after their admission to a nursing facility;

b.      Whether the defendants fail to comprehensively evaluate persons with a diagnosis of SMI to determine if they could be served in a community setting as an alternative to admission to a nursing facility; and

c.      Whether the defendants fail to comprehensively assess whether persons with a diagnosis of SMI need specialized services and to provide needed specialized services and active treatment.

40.     There are questions of law common to the PASRR subclass, including *inter alia*: Whether the defendants are violating the PASRR provisions of the Medicaid Act by:  (i) failing to establish a Level II evaluation program that accurately determines if persons with SMI who apply for admission to a nursing facility can be appropriately served in a more integrated community residential setting; (ii) failing to conduct professionally acceptable assessments to determine the specialized services these individuals require; and (iii) failing to provide an array of specialized services to persons with SMI in nursing facilities who need them in a manner that satisfies the federal standard for active treatment.

41.     The individual plaintiffs' claims are typical of the claims of the class and the PASRR subclass.

42.     The representative parties will fairly and adequately protect the interests of the class and PASRR subclass.  The plaintiffs will vigorously represent the interests of the unnamed class members, and all members of the class and the PASRR subclass will benefit by these

efforts.  The interests of the class and the PASRR subclass and those of the plaintiffs are identical.

43.     The defendants, their agents, employees, and predecessors and successors in office have acted or will act on grounds generally applicable to the class and the PASRR subclass, thereby making appropriate injunctive or declaratory relief with respect to the class and the PASRR subclass as a whole.

## V.     STATEMENT OF FACTS

### A.     *Statutory Framework*

#### (1)     The Americans with Disabilities Act and the Rehabilitation Act

44.     On July 12, 1990, Congress enacted the ADA, establishing the most important civil rights laws for persons with disabilities in our nation's history.

45.     Congress stated in its findings that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."  42 U.S.C. § 12101(a)(2).

46.     Congress found that "discrimination against individuals with disabilities persists in . . . institutionalization . . . and access to public services."  42 U.S.C. § 12101(a)(3).  Congress also found that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion . . . , segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities."  42 U.S.C. § 12101(a)(5).

47.     Congress further concluded that "[i]ndividuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our

society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society."  42 U.S.C. § 12101(a)(7) (1990).

48.     A major purpose of the ADA is to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities and to provide clear, strong, consistent, and enforceable standards addressing discrimination against individuals with disabilities.  42 U.S.C. § 12101(b)(1) & (2).

49.     Title II of the ADA applies to all "public entities," including the defendants herein.  42 U.S.C. § 12131(1)(b).  It provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to any discrimination by such entity."  42 U.S.C. § 12132.

50.     In *Olmstead v. L.C.*, 527 U.S. 581 (1999), the Supreme Court held that the unnecessary institutionalization of individuals with disabilities constitutes discrimination in violation of Title II of the ADA.  *Id.* at 597.  In so holding, the Court made clear that public entities must serve persons with disabilities in community-based, rather than institutional, settings when: 1) providing community-based services is appropriate; 2) the individual does not oppose receiving such services; and 3) the provision of community-based services can be reasonably accommodated, considering the resources available to the entity and the needs of other persons with disabilities.  *Id*. at 607.

51.     In reaching its decision in *Olmstead*, the Court stated that "unjustified institutional isolation of persons with disabilities is a form of discrimination" because "[i]n order to receive needed medical services, persons with mental disabilities, because of those disabilities,

relinquish participation in community life." *Id.* at 600-601.  In addition, the Court noted that segregation "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and "severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, [and] economic independence." *Id.*

52.     The regulations implementing Title II of the ADA state that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).  The "most integrated setting" is the "setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."  28 C.F.R. pt. 35, App. A, p. 450 (2010).

53.     This Integration Mandate requires that public entities provide individuals with disabilities with "opportunities to live, work, and receive services in the greater community, like individuals without disabilities."  *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.*, https://www.ada.gov/olmstead/q&a_olmstead.htm (last updated Feb. 25, 2020 / last visited September 26, 2022).  Accordingly, the defendants must provide unnecessarily institutionalized persons and those at risk of unnecessary institutionalization, such as persons with disabilities in nursing facilities, with "opportunities to live in their own apartments or family homes, with necessary supports," as well as "expand[] the services and supports necessary for [their] successful community tenure," rather than providing services in large congregate facilities.  *Id.*

54.     Section 504 of the Rehabilitation Act also prohibits discrimination on the basis of disability.  Section 504's implementing regulations also contain an Integration Mandate, which requires that recipients of federal funds "administer programs and activities in the most

integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R.

§ 41.51(d).

55.     The ADA and Section 504 regulations also prohibit the differential treatment of individuals with disabilities or any class of individuals with disabilities with respect to their opportunity to access the full range of aids, benefits, or services in any program operated by a public entity.  *See* 28 C.F.R. §§ 35.130(b)(1)(ii) & (b)(1)(iv), 41.51(b)(1)(ii) & (b)(1)(iv); 45 C.F.R. §§ 84.4(b)(1)(ii) & (b)(1)(iv).

56.     The ADA and Section 504 regulations prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination, including unnecessary institutionalization, or "that have the purpose or effect of substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."  *See* 28 C.F.R. §§ 35.130(b)(3), 41.51(b)(3); 45 C.F.R. § 84.4(b)(4).

57.      The ADA regulations further specify that "[a] public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service program or activity unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered."  28 C.F.R. § 35.130(b)(8).

58.     Both the ADA and Section 504 also require that public entities must make reasonable modifications in their policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, including the unnecessary segregation or institutionalization of individuals, unless such modifications would fundamentally alter the nature of the service, program, or activity.  28 C.F.R. § 35.130(b)(7); § 41.53.

59.     Thus, the ADA and Section 504, as interpreted by the Supreme Court in *Olmstead*, require that public entities like the Commonwealth and EOHHS provide services to people with disabilities in the most integrated setting.  The ADA and Section 504 also prohibit these entities from discriminating on the basis of disability; from denying persons with disabilities equal access to their benefits, programs, and services; from employing eligibility criteria that screen out or tend to screen out certain persons with disabilities; and from administering their public services in a manner that denies persons with disabilities full participation in the entity's programs and services.

(2)     The Medicaid Act

60.     The reasonable promptness provision of the Medicaid Act requires that States provide all medical services promptly, and no longer than 90 days, from the time the service is deemed necessary or, if a HCBS program, the person is deemed eligible for the program.  42 U.S.C. § 1396a(a)(8).

61.     The freedom of choice provision of the Medicaid Act requires that States provide meaningful information that allows a person with a disability to make an informed choice between institutional services, like nursing facilities, or community services, like HCBS.  42 U.S.C. § 1396n(c)(2)(C).

(3)     The Nursing Home Reform Act Amendments to the Medicaid Act

62.     The Nursing Home Reform Act (NHRA) of 1987 amendments to the Medicaid Act, 42 U.S.C. § 1396r(e), which include the PASRR provisions, are part of a comprehensive remedial statute designed to address the widespread problem of warehousing people with mental illness and developmental disabilities in nursing facilities.  Congress enacted the PASRR

provisions of the NHRA to prevent and remedy the unnecessary admission and confinement of people with mental illness and developmental disabilities in nursing facilities.

63.    The PASRR provisions require a careful screening of all individuals being considered for admission to a nursing facility to determine if they may have a mental illness. This is referred to as the Level I PASRR screen.  42 C.F.R. § 483.128(a).

64.    The State must then, for all persons seeking admission to a nursing facility whose Level I PASRR screen indicates that they may have a mental illness, evaluate and determine whether they satisfy the State's nursing facility level of care criteria, whether their needs could be met in the community through the provision of appropriate alternative services, and whether they could benefit from the provision of specialized services to maximize their ability for self-determination and independence. This more in-depth evaluation is referred to as the Level II PASRR review. 42 C.F.R. §§ 483.128(a), 483.132, 483.134.

65.    If the Level II PASRR review determines that a person with a mental illness requires specialized services, the State, through its State Mental Health Authority, must provide or arrange for the provision of these services.  42 C.F.R. § 483.120(b).

66.    PASRR reviewers are obligated to explain to the individual involved and, where applicable, his or her legal representative, the results of the Level II PASRR evaluation, including information regarding the individual's ability to reside in a less restrictive community placement, and must provide the individual and any legal representative with a copy of the PASRR report.  42 CFR §§ 483.128(k), 483.130(l)(3).

67.    If an individual with a mental illness is admitted to a nursing facility, periodic reviews must be conducted whenever there is a change in the person's condition to determine whether the individual continues to need a nursing level of care and to require confinement in a

nursing facility.  The periodic PASRR Level II evaluations must also determine whether specialized services are necessary to provide active treatment.  42 U.S.C. § 1396r(e)(7)(A) & (B); 42 C.F.R. §§ 483.128(h)(5), 483.132, 483.134.

68.     If the PASRR review determines that an individual with mental illness admitted to a nursing facility needs specialized services, it must then be determined whether the nursing facility can provide all needed specialized services and active treatment.  If the review concludes the facility cannot provide the required level of active treatment, or if the individual's needs exceed the level of services that the nursing facility does provide, the individual cannot be admitted to that nursing facility.  42 C.F.R. § 483.126.

69.     Thus, the Medicaid Act requires that covered services, like Medicaid-funded HCBS, be provided promptly; that States offer Medicaid recipients information and an opportunity to make a meaningful choice to receive community services before being institutionalized in a nursing facility; and that, for people with mental illness, individuals be screened prior to admission to a nursing facility, be evaluated to determine if an alternative community placement would be appropriate, and if admitted to a nursing facility, provided a range of specialized services necessary to treat their psychiatric condition.

(4)     Massachusetts Equal Choice Law

70.     The Medicaid Act's PASRR provisions are mirrored in the Commonwealth's "Equal Choice Law," Mass. Gen. Laws Ch. 118E, § 9(3), which requires the defendants to provide pre-admission counseling and an assessment for community services to any person at risk of entering a nursing facility.  The statute applies to all individuals, regardless of disabling condition, and is intended to avoid unnecessary segregation in a nursing facility by ensuring that

those at risk of institutionalization are provided meaningful choices and actual service options in the community.

        B.     *The Administrative Framework*

        (1)    <u>The Commonwealth's Medicaid Program</u>

71.    State participation in the Medicaid program is optional.  States choosing to receive federal matching funds for their Medicaid program must comply with the requirements of the Medicaid Act and federal regulations promulgated by the U.S. Department of Health and Human Services.  42 U.S.C. § 1396, 42 C.F.R. § 430 *et seq.*

72.    As a condition of participating in the Medicaid program, States must submit to the Centers for Medicare & Medicaid Services (CMS) a State Medicaid Plan (State Plan) that fulfills the requirements of the Medicaid Act. 42 U.S.C. § 1396a(a).

73.    The federal government pays approximately 50% of the cost of the Medicaid services, including nursing facility services, that MassHealth provides, with the Commonwealth funding the balance.  Significantly, the federal government pays a much higher percentage (approximately 80%) of certain administrative costs, including case management and pre-admission screening to nursing facilities.  There is no overall limit on how much the federal government will pay for Medicaid services, i.e., if covered services are provided to eligible beneficiaries as specified in the State Plan, the federal government must participate in sharing the costs of those services.

74.    According to the federal government website Medicaid.gov, as of May 2022, approximately 1,894,844 Massachusetts residents were enrolled in the Medicaid program. Approximately 22,000 of those Medicaid recipients reside in nursing facilities.

(2)      The Commonwealth Agencies that Deliver Long-Term Care Services

75.      EOHHS is the lead state agency responsible for designing, developing, administering, and overseeing the Commonwealth's long-term care system, which includes both institutions, like nursing facilities, and community programs, like HCBS.  EOHHS includes, among other sub-agencies, EOEA, MassHealth, DPH, DMH, DDS, and MRC.  Each of these agencies has direct responsibility for certain groups of persons with disabilities in nursing facilities or for certain tasks related to nursing facilities.  Each agency also has direct responsibility for certain community components of the Commonwealth's long-term care system.

76.      MassHealth funds both nursing facilities and certain HCBS programs using Medicaid funds.  DPH oversees and certifies nursing facilities.  EOEA has the responsibility for and manages most programs that serve older adults.  DMH is the primary agency responsible for providing long-term care services to persons with SMI and the PASRR program for people with mental illness.  DDS is the primary agency responsible for providing services to persons with IDD and for administering and managing the Commonwealth's residential habilitation waivers.  MRC has the primary responsibility for persons with physical disabilities.

C.      *The Commonwealth's Nursing Facilities*

77.      The Medicaid Act defines a nursing facility as an institution which primarily provides: (1) skilled nursing care; (2) rehabilitation services for those who are sick, injured, or disabled; or (3) health-related care and services to individuals who, because of their mental or physical condition, require care and services in an institutional setting.  42 U.S.C. § 1396r(a)(1)(A-C).

24

78.     Services provided in nursing facilities are defined as "services which are . . .
required to be given an individual who needs . . . on a daily basis nursing care (provided by or
requiring the supervision of nursing personnel) or other rehabilitation services which as a
practical matter can only be provided in a nursing facility on an inpatient basis."  42 U.S.C.
§ 1396d(f).

79.     Nursing facilities are institutions that provide residential services and supports in
a segregated setting.  Despite often being called nursing "homes," they are not real homes or
even home-like.  Rather, they are residential institutions that congregate large numbers of
unrelated persons with disabilities who did not know each other before entering the facility and
have not chosen to live together.

80.     Most nursing facilities more closely resemble medical institutions — they have
nurses' stations, dispense medications, and sometimes use alarmed doors to monitor persons
leaving and entering the facility or its wards.  Some have locked doors, accessible only with an
employee code or pass key.

81.     There is little, if any, privacy for persons with disabilities in nursing facilities.
Individuals often share rooms with other people whom they did not know previously and with
whom they did not choose to live.  They often cannot even close the doors to their own rooms.

82.     Meals are provided based upon a schedule dictated by the institution.  People with
disabilities have little choice about what and when to eat.  Food selection rarely reflects the
ethnic or racial diversity of the people with disabilities in nursing facilities.

83.     Nursing facilities are stark environments where residents have a minimal number
of personal possessions that usually cannot be secured.  People with disabilities in nursing

facilities have little, if any, choice regarding when to wake, sleep, shower, how to spend their days, and if and when to leave the facility for "outings."

84.     Persons with disabilities in nursing facilities are neither integrated into, nor have opportunities to participate in, the communities in which they live or had lived prior to admission to the nursing facility.  They have limited access to the community, and rarely participate in community activities, such as meeting friends, attending religious services, attending civic events, or even simply sitting outside in parks or at other public spaces.

85.     Most persons with disabilities in nursing facilities never have the opportunity to leave the facility — not because their condition precludes it, but simply because there are few opportunities and limited means to do so.

86.     Virtually all persons with disabilities in nursing facilities are denied access to meaningful employment and education opportunities due to the segregated environment in which they live and the limited supports that they are provided.

87.     Many persons with disabilities in nursing facilities never receive visitors, even before the COVID-19 pandemic.

88.     During the pandemic, people in nursing facilities have been even more isolated. In early April 2020, nursing facilities in Massachusetts closed to visitors, including family, to prevent the spread of COVID-19.  People living in nursing facilities went for over a year without face-to-face visits with family and friends from their communities.

89.     The harm of institutionalization in nursing facilities has been dramatically magnified by COVID-19.  Almost one in seven persons in nursing facilities in Massachusetts died during COVID-19.  Even after EOHHS-mandated lock downs, the use of protective equipment and other precautions, and the provision of additional resources, persons with

disabilities died – and continue to die – at an alarming rate.   Living in a segregated and congregated nursing facility dramatically increased the probability of premature death for persons with disabilities.

90.     These harms and risks are not evenly distributed even in nursing facilities. Persons with more significant disabilities suffer and die more frequently.  Black people and other people of color with disabilities are disproportionately impacted by the pandemic and disproportionately harmed by unnecessary institutionalization in nursing facilities. Black persons with disabilities in nursing facilities experience higher levels of physical restraint, feeding tubes, and psychotropic medications than their white peers.

91.     Race-based segregation in nursing facilities is extensive and impacts quality of care.  Nursing facilities located in and targeted to persons from communities of color are routinely more poorly resourced, have higher admission rates, are more poorly staffed, and, not surprisingly, deliver poorer health outcomes for Black persons with disabilities.

92.     Although nursing facilities provide a place to live, most do not provide active treatment designed to meet the mental health needs of persons with disabilities, and particularly people diagnosed with SMI or other cognitive disabilities.  The care provided is primarily custodial, at least for persons with disabilities who remain in these facilities for long periods. For Black persons with Alzheimer's dementia in nursing facilities, even custodial care can be lacking; there is increased prevalence of unsupported diagnoses of schizophrenia; and their care needs are more likely to be addressed through inappropriate use of psychotropic medications than their white peers.

93.     Historically, there has been a shortage of qualified direct-care staff and trained professionals, which has only compounded during the COVID-19 pandemic. Older non-white persons with disabilities in nursing facilities had the highest rates of COVID-19 hospitalization.

94.     The operational practice of nursing facilities is to care for people in a segregated setting rather than to have them care for themselves in an integrated one.  Consequently, older adults and individuals with disabilities in nursing facilities often regress and deteriorate, losing basic skills and competencies needed to live successfully in the community.

95.     As a result of these pervasive institutional conditions, persons with disabilities in nursing facilities suffer harm from unnecessary confinement in segregated facilities, when they could receive the same services and supports in an integrated community residential setting.

D.     *The Commonwealth's Community Services for Persons with Disabilities*

96.     Virtually all of the services provided in a nursing facility can be, and in fact are, also provided in integrated community settings.  Significantly, many, if not most, individuals currently receiving services in a nursing facility qualify for EOHHS' HCBS waiver programs.  In fact, the eligibility criteria for these community waiver programs are identical to the eligibility criteria for nursing facilities.

97.     EOEA is responsible for the planning, development, and implementation of home care programs for older adults in the Commonwealth.  EOEA administers a range of programs that are supposed to provide information, referral, needs assessment, care coordination, and support services for eligible individuals.  EOEA operates its home care programs through a network of 24 non-profit entities called ASAPs  It delegates authority to these ASAPs to support the older adults who participate in its home care programs, including the responsibility for providing pre-admission counseling to avoid nursing facility admission and for conducting

clinical eligibility determinations for long-term stays in nursing facilities.  Few, if any, ASAPs regularly provide information about community options, visits to community programs, accommodations to ensure informed choice, and transition planning and assistance to secure residential services and supports.  While ASAPs can help divert or transition older adults from nursing facilities who do not need residential services, ASAPs lack the capacity to provide residential services or housing with the supports that are often needed to successfully divert or transition older adults with disabilities from nursing facilities.

98.     For persons with SMI, DMH plans, develops, administers, and monitors both community residential and supports services, which are theoretically available to persons diagnosed with SMI in nursing facilities.  DMH funds, licenses, and oversees a range of community residential services for persons with SMI, including community group homes, apartments with live-in staff, supported housing, and subsidized, accessible housing units that are leased by the individual with rental subsidies provided by DMH.  As a practical matter, however, DMH rarely offers its existing long-term services to persons diagnosed with SMI in nursing facilities, and usually terminates eligibility for any existing services, like case management, once such persons enter an institution.

99.     Even though DMH statutorily administers the PASRR program for persons with mental illness, which is supposed to evaluate whether persons diagnosed with mental illness who are referred to nursing facilities could be better served in the community, virtually no persons diagnosed with mental illness are diverted from admission.  This failure to divert significantly impacts people of color, who are diagnosed with mental illness at higher rates than their white peers.  And although the PASRR program is supposed to determine what specialized services persons diagnosed with mental illness in a nursing facility need to actively treat their psychiatric

disability, and although DMH is mandated by federal law to provide these specialized services, this almost never happens.

100.    MassHealth's community programs, other than its capacity-limited HCBS or Group Adult Foster Care programs, do not provide community residential services or supports necessary to allow persons with disabilities in nursing facilities to transition to the community, even though thousands of persons who receive long-term supports from MassHealth need residential services in order to live or remain in the community.

101.    For older adults who meet specific eligibility criteria (aged 60 and older, or under 60 with a diagnosis of Alzheimer's disease or related disorder), there are only non-residential services and supports available through MassHealth.  Assisted Living Facilities (ALFs) are not routinely available for older adults on Medicaid, and particularly for older adults from communities of color.  Moreover, the regulatory and rate structure for the ALF program preclude providing small, integrated residential services in the community for older adults.  As a result, older adults without a home to return to in the community are often unnecessarily institutionalized in nursing facilities.

102.    MassHealth also administers several HCBS waiver programs,[3] which provide an array of Medicaid-funded residential and support services in the community to a small number of individuals who meet specific eligibility criteria.  Eligibility for a HCBS program is based on a determination that the individual is Medicaid-eligible and meets the clinical requirements for admission to a nursing facility, but could be served in the community with appropriate supports.

---

[3] HCBS waiver programs are authorized pursuant to 42 U.S.C. §1396(n), which allows states to provide Medicaid services in the community without meeting (i.e. waiving) various institutional requirements.

Some HCBS programs provide a full-time residential setting or home, while others only provide support services and the persons with disabilities must locate their own living arrangements.

103.    In total, Massachusetts has 10 HCBS waiver programs serving a range of specific populations, seven of which are limited to children or persons with specific disabilities as a result of prior litigation, thus excluding the individual plaintiffs and others like them.  Only one – the Frail Elder Waiver – focuses on older adults, but it does not include any residential services.

104.    There are only two HCBS waiver programs that provide both residential services and supports to all persons in nursing facilities and are not limited by age or disability.  They are not focused only on persons with disabilities living in nursing facilities, however, but instead also serve individuals interested in leaving psychiatric hospitals, rehabilitation facilities, and other health care institutions.  In effect, these two waivers – the Moving Forward Residential Habilitation and Community Living Programs (together referred to as the MFP waiver programs) – are the only options that provide residential services and supports for persons with physical disabilities, persons diagnosed with SMI, and older adults with disabilities in nursing facilities.

105.    The MFP waiver programs offer a range of residential services and supports adequate to allow most persons with disabilities to transition to the community and live in more integrated settings.  However, each is restricted to a fixed number of persons, with only 50 new "slots" per year for persons needing residential services and 75 new "slots" per year for persons who have their own housing but need other community supports.  The capacity of these waiver programs is plainly insufficient to meet the needs of people with disabilities in nursing facilities for integrated long-term care services.

106.    The Commonwealth recently announced the renewal of a federal demonstration program called Money Follows the Person (MFP Demonstration).  This program provides some limited outreach efforts, transition planning, and assistance in *applying* for community services like the MFP waiver program.  But the MFP Demonstration does not provide any community services or supports, including residential services, to persons once they leave a nursing facility, except for one year of case management.  Such residential and support services are only available through the MFP waiver programs.

107.    Although the MFP waiver programs are funded by MassHealth with eligibility determinations made by MassHealth's partners at the University of Massachusetts, the Residential Habilitation program is managed and administered by DDS, with oversight and funding provided through MassHealth, due to DDS's long experience in serving persons with IDD and ABI in residential settings.  The Community Living program is managed and administered by MRC, with oversight and funding provided through MassHealth, due to MRC's experience in serving persons with physical disabilities in their own homes.  Neither of these state agencies are dedicated to serving, or even experienced with, the needs of persons with SMI or older adults with disabilities who do not meet the eligibility requirements for other State agency services.

(1)    EOHHS Provides Integrated Long-Term Care for People with IDD and ABI

108.    The Commonwealth has successfully transitioned other populations from segregated nursing facilities to integrated community living arrangements.  As a direct result of two settlement agreements to resolve ADA and Medicaid claims for persons with IDD in nursing facilities, the Commonwealth offers two specially designed HCBS programs that offer a broad

range of residential services and supports which are sufficient to allow virtually any person with IDD to leave a segregated nursing facility and live in an integrated setting in the community.  As a result, more than 1,800 persons with IDD in nursing facilities – or more than 90% of all persons with IDD who were segregated in nursing facilities 20 years ago – are now living full lives in community homes with appropriate supports.  *Rolland v. Cellucci*, 191 F.R.D. 3 (D. Mass. 2000) (first settlement agreement); *Rolland v. Patrick,* 562 F. Supp. 2d 176 (D. Mass. 2008) (approving second settlement); *Rolland v. Patrick,* 946 F. Supp. 2d 226 (D. Mass. 2013) (termination).

109.    The Commonwealth has successfully used PASRR to identify people with IDD who could live in the community with supports.  As required by those settlement agreements, a significantly restructured PASRR IDD program now successfully diverts most persons with IDD away from long-term institutionalization in nursing facilities and provides an array of specialized services and active treatment to those persons with IDD who do reside in such facilities.  These specialized services include regular opportunities to leave nursing facilities, participate in community activities, learn about community living, and develop skills necessary for a successful return to the community.

110.    Each person with IDD who is admitted to a nursing facility, generally for short-term rehabilitation, is assigned a service coordinator who develops a service and transition plan, and who coordinates and ensures the provision of services in the nursing facility that allow the individual to transition successfully to the community.  Service coordinators are responsible for providing persons with IDD with information about community living, facilitating visits to community programs, addressing concerns about community supports, resolving obstacles to community transition, accommodating the impact of IDD and institutionalization on the

transition process, and ensuring that each person with an IDD can make an informed choice of whether to remain in, or leave, a nursing facility.

111.     Similarly, pursuant to two other settlement agreements entered to resolve ADA and Medicaid claims for persons with ABI in nursing facilities, the Commonwealth created two specially-designed HCBS programs that offer a broad range of residential services and supports that are sufficient to allow most persons with ABI to leave a segregated nursing facility and live in an integrated setting in the community.  *Hutchinson v. Patrick,* 636 F.3d 1 (1st Cir. 2011), affirming 683 F. Supp. 2d 121 (D. Mass. 2010); C.A. 07-30084-MAP (Final Comprehensive Settlement Agreement, September 16, 2008; Amended Settlement Agreement, July 12, 2013). As a result, more than 1,200 persons with ABI once in nursing facilities are now living productive lives in community homes with appropriate supports.

112.     As required by the *Rolland* and *Hutchinson* settlement agreements, staff from DDS and MRC regularly visit nursing facilities to meet with persons with ABI and provide information and opportunities to make an informed choice about whether to transition to the community.  Case managers are assigned to each person with ABI who is interested in community living in order to facilitate visits to community programs, address concerns about community supports, resolve obstacles to community transition, accommodate the impact of disabilities and institutionalization on the transition process, arrange transitions to residential services, and ensure that each person with a disability can make an informed choice of whether to remain in, or leave, a nursing facility.

(2)     EOHHS Does Not Provide Integrated Long-Term Care for Other People in Nursing Facilities

113.     Unlike people with ABI or IDD, other persons with disabilities in nursing facilities do not have assigned case managers who provide meaningful choices, arrange and coordinate visits to community programs, identify housing options, facilitate transitions to residential services, and address barriers to community-based care.  Unlike their fellow nursing facility residents with ABI or IDD, they do not have access to residential services to help them secure housing and needed supports in the community.

114.     Despite the statutory, regulatory, and policy mandates that require the provision of services in the most integrated setting, the Commonwealth has not taken necessary actions to ensure that persons with disabilities in nursing facilities, including older adults with disabilities, can promptly access residential and support services that will allow them to transition to integrated community settings.  Instead, it has developed, implemented, and administered its long-term care system in a manner that relies heavily on segregated nursing facilities to provide residential care and that effectively denies persons with disabilities in nursing facilities access to these same services in an integrated community setting.

115.     The Commonwealth's long-term care system: (1) lacks an adequate and sufficient array of culturally competent, community residential services and supports to equitably meet the needs of all persons with disabilities in nursing facilities; (2) fails to adequately and regularly inform them of HCBS options, including residential services; (3) fails to engage and accommodate their disabilities, to ensure that they can make an informed choice about whether to leave or remain in a segregated facility; and (4) lacks adequate case management services that can plan, coordinate, and monitor residential services necessary to transition persons with disabilities from nursing facilities.

116.     Most persons with disabilities in nursing facilities could reside in integrated, community-based settings if they were able to timely access, with reasonable modifications, the full array of residential and support services that already exist and that the Commonwealth already provides to persons with IDD or ABI in nursing facilities.

117.     Although the defendants know that many persons with disabilities residing in nursing facilities need residential supports and services in order to live safely in the community, through its planning, administration, and funding of its long-term care system and the policies and practices that govern this system, the defendants effectively restrict and/or deny these and other necessary services.  As a result, persons with disabilities in nursing facilities remain unnecessarily institutionalized in segregated nursing facilities, often for many years or decades.

118.     This institutionalization is not only unnecessary, it is dangerous and unlawful. The pandemic has starkly revealed the cost – in human suffering and lives – that unnecessary confinement in segregated and congregated nursing facilities creates.  The defendants fail to provide community residential services and supports in an integrated setting, and instead require people with disabilities to be institutionalized in nursing facilities in order to receive these same services.  This failure creates a real and present risk of harm and death to those who remain unnecessarily institutionalized in nursing facilities.

119.     For persons with disabilities from communities of color, this risk is even more pronounced.  The location of nursing facilities in or near these communities, the under-resourcing of these facilities, the increased risk of COVID-19, the more serious staffing deficiencies, and the defendants' failure to provide culturally competent residential services and support in integrated settings place people of color at exceptional risk of harm.

120.    The defendants' failure to develop sufficient community residential services and supports is particularly acute for persons with disabilities from communities of color.  They do not fund or oversee a sufficient number of service providers and agencies to deliver needed support services in and for these communities.  There is no program to ensure people have culturally competent case managers who provide information and opportunities in a manner that allows persons with disabilities from diverse communities to make an informed choice whether to remain in nursing facilities or return to their communities.  The defendants do not collect or report on relevant data pertaining to the needs, services, capacity, and choices of persons with disabilities from communities of color and linguistically diverse populations.

(3)    The Failure to Provide Community Services for Persons Diagnosed with SMI

121.    For persons with SMI, the Commonwealth, through EOHHS and DMH, fails to: (1) accurately identify individuals diagnosed with SMI who are referred to nursing facilities; (2) determine if they could be appropriately served in community settings instead of being admitted to nursing facilities; (3) comprehensively assess their need for specialized services; and (4) timely provide those services in nursing facilities.  This systematic failure to administer a PASRR program that complies with federal law results in the unnecessary institutionalization and lack of treatment of persons diagnosed with SMI in nursing facilities.

122.    By failing to accurately identify and evaluate persons diagnosed with SMI referred to nursing facilities, the Commonwealth's PASRR program significantly undercounts the number of individuals with SMI and denies them the protections of federal law, the opportunity for diversion from unnecessary admission, and the provision of specialized services in nursing facilities.  The failure to provide specialized services even to persons who are

eventually identified as having SMI results in the lack of active treatment, including those services that would allow them to transition to the community.

123.    The defendants have long been aware of the lack of residential and support services, regular in-reach/outreach to provide information about community living, an informed choice process, and case management for persons with disabilities in nursing facilities.  In 2008, EOHHS developed, but then abandoned, a comprehensive nursing facility diversion and transition program that would apply to all persons with disabilities.  In 2000, 2008, and 2013, EOHHS agreed to comprehensive reforms of its system to divert and transition persons with IDD and ABI from nursing facilities, and then created targeted residential and support services, in-reach and informed choices processes, and case management programs to implement these agreements.  In 2016, it added two new HCBS programs for all persons with disabilities in nursing facilities, but limited the annual increase in capacity to 50 residential and 75 non-residential "slots."  In 2017, it reviewed its Olmstead Plan and decided to focus primarily on homeless persons rather than those unnecessarily institutionalized in nursing facilities who needed residential services and supports to live in the community.  Finally, it collects data every quarter of every year which confirms that its PASRR program for persons with SMI virtually never diverts anyone from nursing facility admission and never determines that anyone with SMI needs specialized services.

E.      *The Impact of the Commonwealth's Failures on the Individual Plaintiffs*

(1)     John Simmons

124.    John Simmons is a 73-year-old Black man with pulmonary emphysema, HIV, and a major depressive disorder.  He uses a wheelchair for mobility, but can at times walk with a walker

or cane.  He is knowledgeable, friendly, and very well informed about local and national affairs. He likes meeting and talking with other people.

125.    Mr. Simmons has resided at The Rehabilitation & Nursing Center at Everett since March 11, 2019.  His nursing facility admission occurred following a hospitalization related to depression.

126.    For many years prior to his placement in a nursing facility, Mr. Simmons lived independently in Boston in his own apartment with a Section 8 voucher that paid part of his rent and made his apartment affordable.  He met all of his personal needs without assistance.  He spent time with family and friends, occasionally dined out, managed his own funds, did his errands, and attended all his medical appointments.  As a result of his pulmonary emphysema, he struggled to climb the stairs to reach his fourth-floor apartment.

127.    Following several hospitalizations, Mr. Simmons lost his Section 8 voucher and was not able to get it reinstated.  He then moved in with his sister in Fall River, Massachusetts, until the hospitalization which led to his nursing facility admission.

128.    DMH, through its agents at the University of Massachusetts, conducted a Level II PASRR for Mr. Simmons in March 2019.  The evaluation concluded that Mr. Simmons did not meet the criteria for mental illness, that the nursing facility was appropriate to meet his needs, and that he did not require any specialized services.  Consequently, Mr. Simmons does not receive any specialized mental health services, any active treatment, or any consideration for community living.

129.    According to Mr. Simmons' nursing facility records, his mental health has declined during the time he has resided at the nursing facility.  His depression has increased in severity.  The prospect of not returning to the community has exacerbated his depression.

130.     During the COVID-19 pandemic, the nursing facility imposed social restrictions which increased Mr. Simmons' isolation and his psychosocial deterioration.  He indicated to the facility that he wished to spend more time outside because he could not spend time indoors with other residents and could not have any visitors, but he was told that he could not go outside. That restriction currently remains in place.  The facility insisted that he can get fresh air by going to an outdoor patio connected to the facility, but since many staff and residents use that area to smoke, that option is not safe due to his pulmonary emphysema.

131.     Medical and social services professionals who have worked with Mr. Simmons have described him as mostly independent and clearly appropriate for community living with limited support.  He did get assistance in submitting an application for an MFP waiver in October 2020, but has been told he is on a long waiting list that extends for years.

132.     Mr. Simmons wants to live independently in the community, in or near Boston since that has always been his home and all his long-term medical providers are at Massachusetts General Hospital.  He could live independently with just the assistance of a weekly visit from a nurse to assist with medication management.  He can cook, shop, clean, and do all the activities of daily living which he did prior to his nursing facility admission.

(2)     David Marsters

133.     David Marsters is a 72-year-old white man who was born with a developmental disability. In 2020, he received a new diagnosis of a high-functioning form of autism spectrum disorder.  He is an outgoing, affable person who likes playing guitar, listening to music, rooting for the Philadelphia Phillies baseball team, and collecting baseball caps and hockey jerseys.

134.    Mr. Marsters was admitted to the Behavioral Unit at Hillcrest Commons Nursing & Rehabilitation in October 2016 from a DMH group home in Southwick after being hospitalized in several medical facilities.

135.    Before his placement in a nursing facility, Mr. Marsters lived independently in an apartment in West Springfield, where he received services from DMH, including a case manager and an outreach coordinator through The Carson Center in Westfield.  DMH also provided transportation for medical appointments, grocery shopping, and to the bank for his weekly allowance.  Mr. Marsters receives support from his sister, Nancy Pomerleau, in making his own decisions about his medical care, housing, and social activities.

136.    Mr. Marsters worked as a janitor from the 1970s until he retired around 2014. Mr. Marsters was married for a year and a half when his wife died of cancer.  He never remarried.  When he lived in his own apartment, he enjoyed listening to music, cleaning and maintaining his apartment, and walking around his neighborhood visiting friends at nearby stores.  Mr. Marsters liked to dine out at restaurants and to go to the store to buy magazines, household supplies, and his favorite snacks.

137.    In 2014, after his mental health deteriorated following severe harassment from the building maintenance staff at his apartment in West Springfield, DMH placed Mr. Marsters in one of its residential programs for 16 months.  In July 2016, DMH transferred him to a respite program, then to another residential program, and then to several hospitals without his consent or his sister's knowledge.  DMH eventually placed Mr. Marsters at Hillcrest Commons, a nursing facility in Pittsfield.  Each facility increased his medications, including adding several psychotropic drugs which created significant, problematic side effects.

138.    Although Hillcrest Commons confines Mr. Marsters on a locked unit at the facility, he periodically spends weekends at a family home in West Springfield, where he thrives. The stress of living in the nursing facility's locked unit has caused him significant frustration and anxiety, and has resulted in a decline in his mental health.

139.    In 2016, DMH, in its capacity as the designated PASRR authority, determined that a nursing facility placement for Mr. Marsters was not appropriate.

140.    A PASRR Level I resident review, conducted by DMH's agent and dated November 10, 2020, inaccurately found that Mr. Marsters has no documented diagnosis or treatment history of IDD before age 22.  The review states that Mr. Marsters has mood and schizoaffective disorders and that he had one or more inpatient psychiatric hospitalizations. Accordingly, Mr. Marsters received a positive mental health screen but was not identified as ever having an IDD.  A letter from the PASRR agency, dated November 20, 2020, notified Mr. Marsters that its Level II evaluation concluded that he did not meet the PASRR criteria for mental illness, and thus no specialized services were required.

141.    On August 23, 2021, DDS completed a PASRR II evaluation and determined that Mr. Marsters had IDD, that nursing facility level of services were required, but that no specialized services were needed.

142.    Mr. Marsters has at times received occupational, physical, and speech therapy, but no ancillary services or specialized PASRR services.  In 2020, his sister successfully advocated for him to leave Hillcrest Commons three days a week and participate in a day program run by Berkshire County Arc, though he was unable to start the program until 2021.  While in the program, Mr. Marsters has thrived when out of the nursing facility and participating in various community activities.

143.    Mr. Marsters wants to live in the community and return to the West Springfield area, where he has worked and lived his whole life.   He is able to live in a community residential setting with support.

(3)    Lorraine Simpson

144.    Lorraine Simpson is a 63-year-old Black woman with anxiety, depression, hypertension, and diabetes.  She is alert, friendly, pleasant. and enjoys talking to people.  She is remarkably independent and mobile, and she actively engages with visitors and staff at the nursing facility.  Her mother, brother, and two daughters live nearby in Worcester.

145.    Ms. Simpson's grandmother raised her.  When her grandmother died, Ms. Simpson fell into a serious depression, and moved in with one of her daughters.  Ms. Simpson's daughter allegedly misappropriated her SSI checks and dropped her off at a homeless shelter at the end of each month.  Ms. Simpson would return to her daughter's home, and this pattern would be repeated.  Eventually, Worcester Elder Services conducted an investigation, then sought the appointment of a guardian based on Ms. Simpson's "failure to thrive as an adult." Sara Spooner, Esq. was appointed as the temporary, and then the permanent, guardian in April 2021.

146.    In April 2021, Ms. Simpson was hospitalized at University of Massachusetts (UMass) Memorial Hospital in Worcester for her diabetes and related conditions.  The discharge summary from UMass Memorial listed her primary diagnosis as depression, anxiety, hypertension, and diabetes.  It did not include dementia as a diagnosis.

147.    Nevertheless, on May 6, 2021, when Ms. Simpson was evaluated for admission to Hermitage Healthcare, the nursing facility administered a Level I PASRR, which claimed that she had dementia and therefore did not meet the criteria for mental illness.  On May 12, 2021, a

Level II PASRR review by DMH also concluded that Ms. Simpson did not meet the criteria for mental illness, allegedly because of having dementia. As a result of this questionable determination, which was contrary to her physician's discharge diagnosis from UMass Memorial Hospital just days before, DMH did not consider any alternatives to nursing facility admission and did not consider her need for specialized services. Consequently, Ms. Simpson does not receive any mental health services or active treatment in the nursing facility and has not been considered for community living.

148.    Additionally, physician progress notes from Hermitage Healthcare, dated May 12, 2021, note a failure to thrive, depression and anxiety, but no mention of dementia. Subsequent progress notes between May 2021 and January 2022 describe only Ms. Simpson's hypertension, diabetes, and an infection from a cut on her toe.

149.    Ms. Simpson has been prescribed psychotropic medications for depression. Notes from the nursing facility consistently state that Ms. Simpson is a long-term patient at Hermitage with no plan for community integration, even though in June of 2021, and repeatedly thereafter, Ms. Simpson stated she wants to leave the facility and move into her own apartment.

150.    Ms. Simpson has remained at the facility for over a year due to a lack of residential and support services. She repeatedly states: "I want to regain my independence." Her guardian believes that she could live in the community with supervision and supports to ensure that she is not subject to exploitation.

151.    Ms. Simpson desperately wants to live independently in the community, cook her own food again, and be close to her family. On information and belief, no action has been taken by DMH to assist her to transition to the community or to apply for HCBS residential services.

(4)    Sherri Currin

152.     Sherri Currin is a 54-year-old white woman with multiple sclerosis who also has SMI and a substance use disorder (SUD).  She was admitted to the Marlborough Hills Rehabilitation and Health Care Center from Clinton Hospital on March 23, 2022.

153.     Before entering the nursing facility, Ms. Currin lived with her partner in an apartment in Marlborough.  She received support services while living in the community, but her partner provided the majority of her care.   She also has three adult children.

154.     Ms. Currin briefly worked as a custodian and secretary at a nail salon but was unable to continue working due to her physical health challenges.  She enjoyed living in the community with her partner, where they watched their favorite television shows together and participated in community activities.   She benefited from home health services from the local ASAP while living in the community.

155.     Ms. Currin was admitted to UMass Memorial Hospital in December 2021 for psychiatric evaluation, which determined that her severe depression caused a failure to thrive.  A guardian was appointed on December 20, 2021, based on her inability to care for herself and failure to take prescribed medication regularly.

156.     A PASRR Level I review, dated March 8, 2022, found that Ms. Currin has mental illness and a substance use disorder.  Based on the findings of the Level I review, DMH, through its agents, conducted a PASRR Level II evaluation on April 8, 2022.  A determination letter from DMH, dated April 14, 2022, notified Ms. Currin that she met the criteria for mental illness and approved her admission to the nursing facility for 90 days while a plan for transition to the community was developed.  The evaluation found that there was no need for specialized services.

157.     A second determination letter from DMH, dated August 3, 2022, reiterated that she met the criteria for mental illness, approved an extension of her stay in the nursing facility until November 1, 2022, and continued to find that no specialized services were needed.  The second determination did not include any reason for the extension.   Significantly, Ms. Currin's condition was noted as "stable and that she was taking her medications per her Care Plan."

158.     Ms. Currin receives occupational and physical therapy, but no specialized PASRR services for her mental illness or SUD.   She uses a wheelchair for mobility and requires supports for activities of daily living, psychiatric supports, and home health care.

159.     Ms. Currin wants to return to living in an apartment in Marlborough.   She is able to live in a community residential setting with supports (her partner is unable to care for her at this time).

(4)     Carole Chojnacki

160.     Carole Chojnacki is a 67-year-old white woman who has been diagnosed with mental illness, chronic obstructive pulmonary disease, type 2 diabetes, chronic kidney disease, and difficulty walking.  She was admitted to The Rehabilitation and Nursing Center at Everett on April 4, 2022, following a psychiatric hospitalization.  In the past, Ms. Chojnacki has been eligible for services through DMH.

161.     According to the nursing facility's medical records, there has never been a PASRR Level I or Level II evaluation done for Ms. Chojnacki, either prior to or after her admission to the facility.  The records also indicate that she does not receive any mental health counseling or other behavioral health treatment in the facility other than psychiatric medications.  Her guardian is not aware of any mental health treatment provided for Ms. Chojnacki at the nursing facility, other than psychiatric medications.

46

162.    Ms. Chojnacki wants to live in a less restrictive setting and needs residential services with supports to transition to the community.  Her guardian supports her discharge to a setting that can monitor and manage her mental health behaviors as well as her medical conditions, such as a DMH group home or other residential setting designed for people with mental health and medical conditions.  DMH currently operates such group homes for adults with these dual needs, on a limited basis, but has not made this program available to Ms. Chojnacki.

(5)    Richard Caouette

163.    Richard Caouette is a 63-year-old white man who has repeatedly expressed his desire to return to the community, which is supported by his guardian and clinical team. Nevertheless, he has remained in a segregated nursing facility for years.

164.    Mr. Caouette has epilepsy, Type 2 diabetes, and SMI.  He was admitted to the Bear Mountain facility in Worcester on June 30, 2020, after receiving psychiatric care at UMASS Memorial Hospital.  Previously, he resided at a nursing facility in Southbridge, Massachusetts since November 2019.

165.    Mr. Caouette is an avid New England Patriots fan, regularly listens to music on Pandora, and is a talented game player.  He wants to transition to a supported living arrangement in or near Worcester so he can go to restaurants, movies, and other community events.

166.    Mr. Caouette is the youngest of 10 children and has a son, although he is not in contact with his family members.  He was placed under guardianship in May 2020 after suffering a stroke.  But by March 2021, his Interdisciplinary Care Plan (ICP) described him as alert, stable, and capable of verbalizing his needs.  A year later, his plan noted his continued request to be transitioned to the community.

167.    A Level II PASRR evaluation conducted by DMH's agent in August 2020 concluded that Mr. Caouette did not meet the criteria for mental illness due to unspecified dementia and, therefore, he was not entitled to any specialized services.

168.    Mr. Caouette has continuously expressed his desire to live in the community.  Mr. Caouette's treatment team and his guardian agree that he can live and thrive in the community with residential services and supports.  Nevertheless, he was denied services from the MFP waiver program due to capacity and service limitations, even though waiver services are precisely what he needs to transition to the community.

(6)    Donald Grant

169.    Donald Grant is a 63-year-old white man with diabetes, respiratory disease, and pulmonary issues.  He uses a wheelchair for mobility.  He was a chef for 45 years and enjoyed deep sea fishing before his placement in a nursing facility.

170.    Mr. Grant initially lived at Odd Fellows Home in Worcester, which conducted a PASRR Level I screening in October 2020, leading to a PASRR Level II evaluation by DMH. The evaluation notice, dated November 3, 2020, did not consider alternatives to a nursing facility but simply approved his admission to the facility.  It also concluded that Mr. Grant did not meet the criteria for mental illness, and therefore was not entitled to any specialized services.

171.    Mr. Grant subsequently was admitted to Worcester Rehabilitation and Health Care Center on May 29, 2021, following inpatient acute medical care and an evaluation for hyperglycemia.  He still resides in that facility.

172.    Staff at the Worcester Center requested that Mr. Grant have a psychotherapy evaluation due to his history of personality disorder and angry outbursts.  The evaluator

determined that Mr. Grant would benefit from therapy to develop appropriate coping mechanisms, but this has never been provided.

173.    Mr. Grant does not want to stay at the nursing facility.  He misses being independent and living in the community.  He would like to transition to a residential setting with supports.  Because of his obesity and related medical challenges, he needs considerable assistance with basic health needs and mobility, which should be available through one of the Commonwealth's MFP residential waiver programs.

## VI.    LEGAL CLAIMS

### First Claim for Relief
### The Americans with Disabilities Act

174.    The plaintiffs reallege paragraphs 1 through 173 as though fully set forth herein.

175.    The individual plaintiffs and members of the plaintiff class are qualified individuals with disabilities within the meaning of the ADA.  42 U.S.C. § 12131(2).

176.    The defendants are "public entities" as defined by Title II of the ADA.  42 U.S.C. § 12131(1).

177.    Through the acts and omissions described above, the defendants are violating Title II of the ADA in the following ways:

*A.    Integration Mandate*

178.    Title II of the ADA requires that "a public entity shall administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).

179.    The individual plaintiffs and members of the plaintiff class qualify for and would benefit from community residential services and supports provided by the defendants' HCBS

programs.  Although community programs are the most integrated setting appropriate to meet

their needs, the individual plaintiffs and members of the plaintiff class remain unnecessarily

institutionalized in nursing facilities due to the defendants' failure to provide them timely access

to existing community residential services and support programs, and by requiring them to be

confined in segregated institutional settings in order to receive essentially the same care, in

violation of 42 U.S.C. § 12132.

> B.    *Methods of Administration*

180.    Title II of the ADA requires that "a public entity may not, directly or through

contractual or other arrangements, utilize criteria or other methods of administration: (i) that

have the effect of subjecting qualified individuals with disabilities to discrimination on the basis

of disability; [or] (ii) that have the purpose or effect of defeating or substantially impairing

accomplishment of the objectives of the entity's program with respect to individuals with

disabilities."  28 C.F.R. § 35.130(b)(3).

181.    The defendants have developed and utilize criteria and methods of administration

for the Commonwealth's long-term care system for persons with disabilities that exclude the

individual plaintiffs and members of the plaintiff class from timely access to residential services

and supports integrated in the community, which results in their unnecessary institutionalization

and unjustified segregation on the basis of their disability, including, *inter alia*, failing to inform

them of the community residential services and supports that would enable them to reside in an

integrated setting; failing to assess them for community residential services and supports; failing

to offer them a meaningful and informed choice of community residential services and supports;

and failing to afford them equal access to community residential services and supports on the

basis of their disability, all in violation of 42 U.S.C. § 12132.

### C.   Eligibility Criteria

182.    Title II of the ADA requires that that a public entity "not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered."  28 C.F.R. § 35.130(b)(8).

183.    The defendants have developed and implemented eligibility criteria for their long-term care system, and specifically for their HCBS programs, that screen out or tend to screen out the individual plaintiffs and members of the plaintiff class who are residing in nursing facilities from gaining access to or enjoying community residential services and supports, in violation of 42 U.S.C. § 12132.

184.    The defendants have failed to provide community residential services and supports to the individual plaintiffs and members of the plaintiff class in nursing facilities that would allow them to transition to integrated settings in the community, even though the Commonwealth provides residential services and supports to individuals with IDD and ABI that have resulted in their successful transition to the community, in violation of 42 U.S.C. § 12132.

### D.   Reasonable Modifications

185.    Title II of the ADA requires that a public entity "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(7)(i).

186.    The defendants have failed to make reasonable modifications to their policies, practices, or procedures that would allow the individual plaintiffs and members of the plaintiff class to obtain the integrated community residential services and supports necessary to avoid unnecessary institutionalization in nursing facilities, in violation of 42 U.S.C. § 12132.

187.    The defendants have failed to provide adequate information, opportunities, and experiences necessary to allow the individual plaintiffs and members of the plaintiff class to make an informed choice whether to remain in a segregated institution or transition to an integrated community setting, in violation of 42 U.S.C. § 12132.

188.    The defendants have failed to make reasonable accommodations to individual plaintiffs and members of the plaintiff class whose condition, disability, or unnecessary institutionalization impacts their ability to make an informed choice about community living, in violation of 42 U.S.C. § 12132.

189.    It would not fundamentally alter the nature of the defendants' programs, services, or activities to provide the individual plaintiffs and members of the plaintiff class with the community residential services and supports necessary to allow them to live in the community.

## Second Claim for Relief
## Section 504 of the Rehabilitation Act

190.    The plaintiffs reallege paragraphs 1 through 189 as though fully set forth herein.

191.    The individual plaintiffs and members of the plaintiff class are qualified individuals with disabilities under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).

192.    The Commonwealth and EOHHS are recipients of federal financial assistance subject to the requirements of Section 504.

193.    Section 504 requires that recipients of federal financial assistance "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons."  28 C.F.R. § 41.51(d).

194.    Section 504 also prohibits recipients of federal financial assistance from "utiliz[ing] criteria or methods of administration ... (i) [t]hat have the effect of subjecting handicapped persons to discrimination on the basis of handicap; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons."  28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b).

195.    The individual plaintiffs and members of the plaintiff class qualify for and would benefit from community residential services and supports provided by the defendants' HCBS programs. Although community programs are the most integrated setting appropriate to meet their needs, the individual plaintiffs and members of the plaintiff class remain unnecessarily institutionalized in nursing facilities due to the defendants' failure to provide them timely access to existing community residential services and support programs, and by requiring them to be confined in segregated institutional settings in order to receive essentially the same care, in violation of Section 504.

196.    The defendants have developed and utilize criteria and methods of administration for the Commonwealth's long-term care system for persons with disabilities that have the purpose and effect of subjecting the individual plaintiffs and members of the plaintiff class to unnecessary institutionalization and unjustified segregation on the basis of their disability, including, *inter alia*, failing to inform them of the community residential services and supports that would enable them to reside in an integrated setting; failing to assess them for community residential services and supports; failing to offer them a meaningful and informed choice of

community residential services and supports; and failing to afford them equal access to appropriate residential services and supports on the basis of their disability, all in violation of Section 504.

197.     The defendants have developed and implemented eligibility criteria for their long-term care system that screen out or tend to screen out the individual plaintiffs and members of the plaintiff class who are residing in nursing facilities from gaining access to or enjoying community residential services and supports, in violation of Section 504.

198.     The defendants have failed to provide community residential services and supports to the individual plaintiffs and members of the plaintiff class in nursing facilities that would allow them to transition to integrated settings in the community, even though the Commonwealth provides these residential services and supports to individuals with IDD and ABI that have resulted in their successful transition to the community, in violation of Section 504.

199.     The defendants have failed to make reasonable modifications to their policies, practices, or procedures that would allow the individual plaintiffs and members of the plaintiff class to obtain the integrated community residential services and supports necessary to avoid unnecessary institutionalization in nursing facilities, in violation of Section 504.

200.     The defendants have failed to provide adequate information, opportunities, and experiences necessary to allow the individual plaintiffs and members of the plaintiff class to make an informed choice whether to remain in a segregated institution or whether to transition to an integrated community setting, in violation of Section 504.

201.     The defendants have failed to make reasonable accommodations to individual plaintiffs and members of the plaintiff class whose condition, disability, or unnecessary

institutionalization impacts their ability to make an informed choice about community living, in violation of Section 504.

202.    It would not fundamentally alter the nature of the defendants' programs, services, or activities to provide the individual plaintiffs and members of the plaintiff class with the community residential services and supports necessary to allow them to live in the community.

**Third Claim for Relief**
**Reasonable Promptness Provision of the Medicaid Act**

203.    The plaintiffs reallege paragraphs 1 through 202 as though fully set forth herein.

204.    Title XIX of the Social Security Act requires States to provide Medicaid benefits to all eligible persons with reasonable promptness and for as long as medically necessary.  42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10)(A).  Provision of services must not be delayed by the agencies' administrative procedures.  42 C.F.R § 435.930(a).

205.    The defendants' arbitrary policies, which limit the provision of medically necessary community residential services and supports, as well as medically necessary specialized services, result in extended delays and the outright denial of medically necessary care to the plaintiffs and members of the plaintiff class.  The community residential services and support, as well as specialized services that the plaintiff subclass needs, are not provided with reasonable promptness, in violation of 42 U.S.C. §§ 1396a(a)(8).

**Fourth Claim for Relief**
**Freedom of Choice Provision of the Medicaid Act**

206.    The plaintiffs reallege paragraphs 1 through 205 as though fully set forth herein.

207.    Title XIX of the Social Security Act requires States to provide Medicaid-eligible persons who qualify for their HCBS programs with a choice of living in an institution, like a

segregated nursing facility, or in a community residence in an integrated setting.  42 U.S.C.

§ 1396n(c)(2)(B) & (C).

208.    The defendants have failed to provide residents of nursing facilities with

disabilities with: 1) notice of and equal opportunities to apply for and access medically necessary

community residential services and supports; 2) an assessment of their eligibility for such

services; and 3) adequate information, opportunities, and experiences necessary to allow the

individual plaintiffs and members of the plaintiff class to make an informed choice whether to

remain in a segregated institution or whether to transition to an integrated community setting, in

violation of 42 U.S.C. § 1396n(c)(2)(B) & (C).

### Fifth Claim for Relief
### Nursing Home Reform Amendments
### On behalf of the PASRR Subclass Only

209.    The plaintiffs reallege paragraphs 1 through 208 as though fully set forth herein.

A.    *Screening, Assessment and Placement*

210.    The NHRA requires that States develop and implement a PASRR program for all

applicants to, and residents of, Medicaid-certified nursing facilities who are suspected of having

an SMI or IDD. 42 U.S.C. § 1396r(e)(7); 42 C.F.R. § 483.100 *et seq.*  Each State's PASRR

program must accurately identify persons with SMI, determine if they could be served in an

alternative setting to a nursing facility, assess whether they need specialized services for the

SMI, and then ensure that such services are provided promptly.  42 U.S.C. §§ 1396r(b)(3)(F)(i),

1396r(e)(7)(A)&(B); 42 C.F.R. § 483.112, 483.116, 483.120.

211.    The defendants have failed to develop and implement a PASRR program that

accurately screens nursing facility applicants for mental illness, assesses whether their needs

could be met in an alternative, less restrictive setting than a nursing facility, and advises them of

the available alternatives to nursing facilities, all in violation of 42 U.S.C. §§ 1396r(b)(3)(F)(i) and 1396r(e)(7)(A) & (B).

B.    *Specialized Services*

212.    The Level II PASRR assessment must determine whether a person with SMI requires specialized services and, if so, must provide those specialized services in the nursing facility.  42 U.S.C. § 1396r(e)(7)(B)(i)(II) & (C); 42 C.F.R. §§ 483.112(b), 483.114(a)(2), 483.116(b)(2), 483.120(b).

213.    Specialized services for individuals with mental illness must include all services which are needed to implement "a continuous and aggressive … individualized plan of care" that, *inter alia*, "is directed toward diagnosing and reducing the resident's behavioral symptoms that necessitated institutionalization, improving his or her level of independent functioning, and achieving a functioning level that permits reduction in the intensity of mental health services to below the level of specialized services at the earliest possible time."  42 C.F.R. § 483.120(a)(i).

214.    The defendants' failure to comprehensively assess the need for specialized services of the individual plaintiffs diagnosed with SMI and members of the plaintiff subclass, and the defendants' failure to provide them with the full range of needed specialized services and active treatment, violates the NHRA, 42 U.S.C. § 1396r(e)(7).

VII.   **PRAYERS FOR RELIEF**

WHEREFORE, the plaintiffs respectfully request that this Court:

1.    Certify this case as a class action pursuant to Fed. R. Civ. P. 23;

2.    Grant permanent injunctive relief to remedy the defendants' violation of the ADA, Section 504, the Medicaid Act, and the NHRA, including requiring the defendants to:

(a)     Provide culturally competent community residential services and supports in the most integrated setting for the individual plaintiffs and members of the plaintiff class, consistent with their individual needs, sufficient to avoid unnecessary institutionalization in nursing facilities in Massachusetts, and ensure that services for persons with disabilities from communities of color are designed to be responsive to the needs of their communities;

(b)     Provide culturally competent case management services to plan, coordinate, and monitor transition services, provide information and opportunities for the individual plaintiffs and members of the plaintiff class to learn about community living, and facilitate their transition into integrated settings in the community;

(c)     Develop and implement a culturally competent informed choice and in-reach process that allows the individual plaintiffs and members of the plaintiff class to make an informed choice whether to remain in a segregated nursing facility;

(d)     Make reasonable modifications to the policies, practices, rules, and requirements regarding the eligibility for and administration of the defendants' long-term care system in order to ensure that the individual plaintiffs and members of the plaintiff class receive the community residential services and supports needed to reside safely in integrated settings;

(e)     Conduct comprehensive PASRR screens and assessments of the individual plaintiffs with SMI and members of the plaintiff subclass to determine whether

their needs could be appropriately met in a more integrated setting than a nursing

facility and determine if they would benefit from specialized services;

(f)       Provide the array of needed culturally competent specialized services and

active treatment to individual plaintiffs with SMI and members of the plaintiff

subclass; and

(g)       Collect and use information, to monitor, adjust, and improve the

modifications to the defendants' long-term care system, including the type and

severity of disability, and the race and ethnicity of members of the plaintiff class;

3.       Issue a declaratory judgment declaring that:

(a)       The defendants have violated the ADA and Section 504 by failing to

provide the individual plaintiffs and members of the plaintiff class with

community residential services and supports in the most integrated setting,

resulting in their needless institutionalization in nursing facilities;

(b)       The defendants have violated the Medicaid Act by failing to provide

community residential services and supports for persons with disabilities in

nursing facilities, and specialized services for persons with SMI, with reasonable

promptness;

(c)       The defendants have violated the Medicaid Act by failing to provide

persons with disabilities with culturally competent information and an informed

choice of whether to receive services in segregated nursing facilities or more

integrated settings in the community; and

(d)       The defendants have violated the NHRA by: i) failing to properly screen

and assess PASRR subclass members' ability to reside in a less restrictive, more

integrated setting than a nursing facility; ii) inappropriately placing PASRR

subclass members in nursing facilities; iii) failing to assess PASRR subclass

members' need for specialized services; and iv) failing to provide PASRR

subclass members with specialized services, including active treatment;

4.    Award plaintiffs their reasonable attorneys' fees, litigation expenses, and costs

pursuant to 42 U.S.C. §§ 1988 & 12205 and 29 U.S.C. § 794a; and

5.    Grant such other relief which is necessary and proper to protect the federal rights

of the individual plaintiffs and members of the plaintiff class.


Respectfully submitted,


/s/ Steven J. Schwartz
Steven J. Schwartz (Bar No. 448440)
Mark J. Murphy (Pro hac vice application pending)
Jennifer Hotchkiss Kaplan (Bar No. 658213)
Tasheena M. Davis (Bar No. 695187)
Center for Public Representation
22 Green Street
Northampton, MA 01060
413-586-6024
Email: sschwartz@cpr-ma.org
Email: mmurphy@cpr-ma.org
Email: jkaplan@cpr-ma.org
Email: tdavis@cpr-ma.org

Deborah Filler (Bar No. 545478)
Elizabeth Crimmins (Bar No. 554542)
Greater Boston Legal Services
197 Friend Street
Boston, MA 02114
Email: dfiller@gbls.org
Email: bcrimmins@gbls.org

Regan Bailey (Pro hac vice application pending)

Eric Carlson (Pro hac vice application pending)
Justice in Aging
1444 I Street, NW, Suite 1100
Washington, DC  20005
Phone: (202) 683-1990
E-mail: rbailey@justiceinaging.org
E-mail: ecarlson@justiceinaging.org

Dean Richlin (Bar No. 419200)
Michael Boudett (Bar No. 558757)
Kristyn Bunce DeFilipp (Bar No. 676911)
Jeremy Meisinger (Bar No. 688283)
Andrew London (Bar No. 690782)
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210
Email: drichlin@foleyhoag.com
Email: mboudett@foleyhoag.com
Email: KBunceDeFilipp@foleyhoag.com
Email: jmeisinger@foleyhoag.com
Email: alondon@foleyhoag.com

*Attorneys for Plaintiffs*