UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN SIMMONS; <br> DAVID MARSTERS, <br> by his next friend, Nancy Pomerleau; <br> LORRAINE SIMPSON, by her guardian, Sara Spooner; <br> SHERRI CURRIN, by her guardian, Sara Spooner; <br> CAROLE CHOJNACKI, by her guardian, Sara Spooner; <br> RICHARD CAOUETTE, by his guardian, Sara Spooner; <br> DONALD GRANT, by his guardian, Sara Spooner, <br> on behalf of themselves <br> and other similarly situated persons; and <br> MASSACHUSETTS SENIOR ACTION COUNCIL, <br><br> Plaintiffs, <br><br> v. <br><br> MAURA HEALEY, in her official capacity <br> as Governor of the Commonwealth of Massachusetts; <br> KATE WALSH, in her official capacity <br> as Secretary, Executive Office of Health and <br> Human Services; <br> MATTHEW GORZKOWICZ, in his official capacity <br> as Secretary of the Executive Office of Administration <br> and Finance; <br> ELIZABETH CHEN, in her official capacity as <br> Secretary, Executive Office of Elder Affairs; <br> and MICHAEL LEVIN, in his official capacity <br> as Assistant Secretary of MassHealth, <br><br> Defendants. | CIVIL ACTION NO. <br> 1:22-cv-11715-PBS |

**INITIAL AFFIDAVIT OF RANDALL WEBSTER**

I, Randall Webster, hereby state as follows:

**I.     Purpose**

1.     I was asked by counsel for the Plaintiffs to review the scope, administration, eligibility criteria, and capacity of the home and community-based services (HCBS) programs administered by the Executive Office of Health and Human Services (EOHHS). These programs

1

are the primary vehicle for providing residential and support services that allow people with disabilities in nursing facilities to transition to integrated settings in the community. I also reviewed the methods used by EOHHS to allow people in nursing facilities to make an informed choice whether to remain in nursing facilities. This affidavit includes the findings and conclusions of my review.

## II.     Qualifications and Experience

2.     I have forty years of experience in the field of services to individuals with an intellectual and/or developmental disability, including twenty-three years as the Director of an Area Office for the Department of Developmental Disabilities (DDS) in Massachusetts. As the Area Office Director, I managed the provision and procurement of services to individuals with a developmental disability, including residential services, day services, employment services, respite services, emergency support services, and family support services in the City of Fall River, Massachusetts and surrounding towns. In that role, I also oversaw the functions of the DDS service coordination program, which is available to eligible individuals in the service area, including both individuals receiving services in the community as well as individuals with an intellectual/developmental disability (I/DD) diagnosis placed in nursing facilities through the Preadmission Screening and Resident Review (PASRR) process. Additionally, I led Area Office compliance with the Consent Decree and federal court orders provided in *Ricci v. Okin*, which placed individuals from Fall River who were living in one the State Schools back in the Fall River community.

3.     I was appointed Assistant Commissioner for Field Operations for DDS from 2011 until my partial retirement in 2014. In addition to general statewide oversight, service design and delivery and policy development, I was responsible for ensuring that any citizen of the

Commonwealth of Massachusetts with an intellectual or developmental disability residing in a nursing facility was either placed into a community setting from a nursing facility or, if remaining in a nursing facility, was receiving services that met the federal standard for Active Treatment. I had a lead role in promoting and achieving substantial compliance with the federal court order and Settlement Agreement in *Rolland v. Patrick*, a case in Massachusetts very similar to this one that required the timely placement of individuals who lived in nursing facilities into the community and/or the provision of Active Treatment to those who remained. As a result of that lawsuit, it has been the intention of DDS since 1999 to implement an aggressive PASRR compliance effort. Since the inception of that policy, over 1,600 individuals have been placed from nursing facilities into community 24/7 residential settings, settings staffed less than 24/7, or moved back to their families as the preferred service setting, rather than having to remain in a nursing facility and receive Active Treatment. Currently there are fewer than 250 individuals residing in nursing facilities at any one time in the Commonwealth with an I/DD diagnosis. Included in PASRR compliance efforts has been and continues to be a very aggressive process to divert individuals from nursing facilities and the prompt placement of individuals approved through the PASRR process to return back to community living.

4.  From 2014-2020, I continued to work as a post-retirement part-time employee of DDS, with lead responsibility for a number of special projects including the transition of persons with I/DD and brain injuries from nursing facilities to the community, and the development of sufficient provider capacity to serve individuals with complex needs including individuals with a mental disability diagnosis in the community. Since then, I have consulted with other states, providers, advocates and families on the administration of I/DD services, with a particular focus

3

on transitioning individuals with disabilities from segregated settings like nursing facilities to community living arrangements.

5. In preparing this affidavit, I reviewed all of the relevant MFP waiver program eligibility requirements, participant handbook, applications and related documents, as well as data from the MFP waivers produced by EOHHS and attached to the Affidavit of Karen Detmers.

### III. Overview of EOHHS' Home and Community-Based Waiver Programs

6. EOHHS, through MassHealth, administers a range of community services and supports, some of which are paid in significant part by the federal government under the Medicaid program. EOHHS is also the umbrella agency for DDS, and was a party responsible for implementing the Settlement Agreements in *Rolland v. Patrick* for individuals with intellectual and developmental disabilities (IDD), and *Hutchison v. Patrick,* for individuals with acquired brain injuries (ABI).

7. The primary Medicaid vehicle for providing community services are called home and community-based waiver programs, which have specific eligibility criteria, limited capacity (called waiver slots), and covered services. Waiver programs are intended to avoid unnecessary institutionalization and are limited to people with disabilities who meet an institutional level of care and would otherwise be institutionalized in a public or private facility.

8. EOHHS is responsible for ten home and community-based waivers approved by the federal Centers for Medicare and Medicaid Services (CMS) that provide community residential services and supports to people with specific disabilities: three for people who have an I/DD diagnosis; one for children with a diagnosis of autism; one for elderly individuals 60 and older some of whom may be disabled (the Frail Elder Waiver [FEW] which provides only

community supports but no residential services); one for people with traumatic brain injuries; two for people who have an acquired brain injury (the Acquired Brain Injury – Residential Habilitation [ABI-RH] which provides residential services in a 24 hour staffed living arrangement and the Acquired Brain Injury -- Non-Residential [ABI-N] which provides residential services in a non-staffed or independent living arrangement) and two cross-disability waivers (the Moving Forward Plan – Residential Supports [MFP-RS] which provides residential services in a 24 hour staffed living arrangement and the Moving Forward Plan – Community Living [MFP-CL] which provides residential services in a non-staffed or independent living arrangement). The target population for these Moving Forward Plan (MFP) waivers include individuals aged 65 and older, as well as individuals aged 18-64 with disabilities, including physical and mental disabilities. These MFP waivers are the only program that supports individuals with a wide range of disabilities. The MFP waivers are the primary, and often the only, vehicle for transitioning individuals with disabilities who need residential services and supports from nursing facilities to integrated settings in the community.

9. Assessments for eligibility for the MFP waiver programs are conducted by the University of Massachusetts (UMASS) Waiver Unit, which operates as an agent of MassHealth pursuant to an Intergovernmental Service Agreement (ISA). Eligibility criteria for an individual to participate in a MFP-RS and MFP-CL waiver includes: (1) meets the target population definition as discussed above; (2) lives in or expects to have lived in a nursing facility, chronic disease or rehabilitation hospital or psychiatric hospital for at least 90 days; (3) needs a nursing level of care; and (4) can be safely served in a qualified setting in which the waiver services and supports can be delivered. These services and supports are detailed in the brochure "Think Outside the Facility" and in the <u>ABI-MFP Participant Handbook</u>.

10. The waiver year (WY) is considered the date the state entity chooses as their effective start date for providing the services as approved by the CMS, and for beginning the determination of available waiver slots. It is also the date established by MassHealth on which applications for the waiver program are formally accepted. For the MFP-RS and MFP-CL waivers, MassHealth has determined that the WY begins on April 1 and has a designated number of unduplicated waiver participants in each WY, as set forth in the waiver application prepared by MassHealth. Pursuant to MassHealth's approved waiver, this number of unduplicated participants increases each WY over the five waiver years of an approved waiver. In each WY there is a modest number of new participants that can be served in the waiver. For example, in the MFP-RS waiver, the current waiver year included 304 unduplicated waiver participants. As requested by MassHealth and approved by CMS, iIn Year 1 of the Renewal Waiver Year the number increases by 60 participants to 364 unduplicated participants. Since waiver participants may die, move, or otherwise become ineligible, the number of new individuals who enter the waiver each year may be slightly greater than 60. If determined clinically and financially eligible, a waiver slot is allocated to the individual, and a transition process is initiated that is expected to result in transition to the community, with the services covered by the waiver program.

**IV.    The Administration of the MFP Waiver Programs**

11. EOHHS, through MassHealth, allows a member of the target population to apply at any time to receive waiver services. Data provided by EOHHS for WY 2016 through 2020 shows that 5,916 applications were submitted for the MFP-RS and MFP-CL waivers. *See* Affidavit of Karen Detmers, Appendix A. Of that total, 5,280 of the applicants were in nursing facilities or 89.2% of all applicants. Of the 5,280 nursing facility applicants, 1,675 (31.7%) were

found eligible for one of the waivers, with 1,292 eligible for the MFP-CL waiver, and 383 for the MFP-RS waiver. Reasons for ineligibility included "sufficient documentation not provided", "safety", "not financially eligible", and "waiver slots full."

12. Because the WY officially starts on April 1, that is the date when slot availability formally increases. The UMASS Waiver Unit opens the new WY application period for all residents at midnight on April 1. All of these applications are clinically reviewed based on the date/order of receipt, and a recommendation is made about the applicants' eligibility once the financial and clinical reviews have been completed.

13. Although the April 1 date for beginning to accept applications for the new WY applies to the general population of nursing facility residents, EOHHS had allowed state agencies to submit applications for their own clients that are considered ahead of the announced slot opening date. For those agencies, including DDS, the Massachusetts Rehabilitation Commission (MRC), and the Department of Public Health (DPH), applications are accepted on February 1 of the current WY. Case management staff within those agencies are encouraged to submit the applications at midnight on February 1, in order to place the applicant in the queue for review prior to the April 1 acceptance of applications from non-state sponsored applicants. This pre-April 1 review allows the applicant to be recommended for eligibility on or just after April 1, while non-sponsored applicants are just beginning their review process. This practice disadvantages many non-sponsored applicants and greatly limits their chance of receiving one of the limited number of new waiver slots.

14. This practice effectively allows for agencies within EOHHS to preempt the April 1 application opening and review date, giving the state agencies and their clients exclusive access to the application and eligibility review process well before making new waiver slots

7

available to the broader population of nursing facility residents. The UMASS Waiver Unit encouraged state agencies to submit waiver applications two months before the new WY, when additional waiver slots are made available to all people interested in receiving waiver services in the community. In effect, this means on midnight on February 1, two months prior to the general population application opening date of April 1, case managers or other parties within EOHHS state agencies can fax/email applications to the UMASS Wavier Unit so that their application will be date/time-stamped for review prior to non-State agency applications from the general nursing facility population. They would also assist in gathering documentation needed by the Waiver Unit to establish eligibility.

15. This practice has given state agency clients virtually exclusive access to new waiver capacity and early review of their clinical and financial eligibility, well before being available to a broader applicant pool beginning midnight on April 1. The practical result has been that DDS individuals turning 22 who reside in the Pappas Rehabilitation Center for Children, I/DD or ABI clients in nursing facilities covered by the Hutchinson Settlement Agreement, or individuals residing in other long term care settings like a DMH psychiatric hospital or chronic care facility with no discharge plan, can be determined eligible for new waiver slots on a priority basis, leaving few, if any, remaining slots for all other individuals in nursing facilities who are not current clients of various EOHHS agencies. With limited waiver slot availability, the effect of the process creates an unfair advantage for people served by state agencies.

16. Over the past several years, additional MFP-RS waiver slots have been generally allocated to state-sponsored clients and a few other individuals by May or June of each WY who happened to apply on the first few days of the new waiver year. With the number of waiver

applicants so large, and the slot availability so limited, particularly in the MFP-RS waiver, it matters when an application is submitted. For example, applying in June of a WY or later when virtually all the MFP-RS waiver slots for that WY have been allocated, will likely result in a denial because waiver slots have been filled. There is no public notice informing potential applicants when the waiver is full. However, when waiver capacity is reached, all subsequent applications are automatically rejected due to lack of capacity, termed by EOHHS as a "denial" because waiver slots are full. Applicants must then reapply on or after April 1 of the next WY, but again, they will very likely face the same hurdles they faced in the prior WY in which they were denied.

17. As mentioned, in each WY there are a set number of new slots available. In recent years, as few as 60 additional slots for the MFP-RS waiver each WY have been made available. Because of the practice of front-loading applications outlined above, the actual number of slots available for the April 1 application pool is dramatically reduced and then quickly filled. Once filled, new applications are denied because the waiver slots are full, as evident from the MFP-RS data, where between 2015 and 2020 the number of denials because of waivers being full ranged from 149 to 195 applicants (a total of 852 denied applicants), with an average of 170.4 denials over the five waiver years.

18. This data has two important implications for target population individuals wishing to receive residential services in the community. First, those without agency sponsorship are at a significant disadvantage in applying for waiver services. It is not a "level playing field." Second, with the number of available slots so limited and demand so high, the needs and preferences of individuals with disabilities in nursing facilities are not reasonably addressed by EOHHS through these waivers.

V.      **Eligibility Criteria for the MFP Program**

19.     The data provided by EOHHS details the reasons for not finding someone eligible for waiver participation.  *See* Affidavit of Karen Detmers, App. A. These reasons include objective categories that align with the waiver application such as "not being financially eligible," "not in a facility of 90 days," and "not providing sufficient documentation for determining eligibility."  They also include more subjective clinical determinations such as "safety," "not needing a waiver service," and "in another HCBS waiver," and are not limited to people who do not actually need a waiver service, based upon the clinical assessment conducted by the UMASS Waiver Unit Level of Care Team.

20.     In the ten years of implementing the *Rolland* Settlement Agreement, which focused on people with I/DD in nursing facilities, there were no individuals excluded from waiver participation because of clinical factors such as safety because all individuals were determined eligible for DDS services and supports.  This was consistent with DDS Policy # 2012-2 which emphasized community services and supports as the most appropriate method for supporting eligible individuals.  Where clinical concerns were identified, DDS developed more intensive residential services and supports to meet the assessed needs of the individuals.  For instance, for individuals with complex medical needs, additional nursing services were incorporated in community living arrangements.  Where individuals had challenging physical conditions, additional equipment, staff, or accessible modifications were included in residential programs.  Where individuals engaged in challenged behaviors or presented safety concerns, additional staff, safeguards, or home modifications were developed as part of the residential services.  Simply put, it was the position of DDS that whatever services needed to be developed to support those individuals in the community, particularly given the loss of skills and abilities

which was a consequence of institutionalization, would be developed, so that no individuals were denied the opportunity to transition to the community due to the nature, severity, or challenges of their disability.  Since DDS and virtually all experts believe that the community service system, if properly administered and funded, provides services that are far safer than institutionalization in a nursing facility, it is plainly more appropriate to modify and enhance that community service system to meet the needs of individuals, than to keep them institutionalized for "safety" reasons.

21.     These modifications often occurred on both a systemic and individual basis.  In some cases, DDS staff had concerns about whether a particular individual and *Rolland* class member could be appropriately served in the community.  In many of those cases, I reviewed the individual's clinical records, met with the individual and/or the family, identified any additional community services that were needed to support the individual, and determined that the individual could be safely, effectively, and appropriately served in the community.  Moreover, I used these individual reviews to develop systemic strategies and service augmentations so that other individuals could be promptly transitioned from nursing facilities to the community in a strengthened community system.

22.     I had a similar role in the MFP-RS program with respect to: (1) eligibility determinations for individuals enrolled in the MFP-RS but subsequently determined to be ineligible through the redetermination reviews; (2) participants hospitalized for over 90 days; (3) case managers who encouraged eligible individuals to dis-enroll from the waivers; and (4)individuals who MRC felt should transfer from the MFP-CL waiver to the MFP-RS waiver. The *Rolland* DDS policy that individuals eligible for DDS services and supports can be best served in integrated services and supports provided in the community was fundamental to my judgment in these cases. When there were occasions where an individual was  recommended to

11

be removed from the MFP-RS waiver for these reasons, I might participate directly or through my clinical team representative and urge that the individual could and should be served in the community through a waiver program, despite the recommendation of the UMASS clinical review team and/or DDS staff who felt the individual should be denied eligibility because of "safety" reasons. I believed that, in most cases, the clinical issues regarding "safety" usually could be addressed through the design and structure of services and supports, as had been done with *Rolland* class members for whom "safety" concerns also were a consideration. I repeatedly noted that a more restrictive eligibility criteria would be unfair to applicants where services and supports built around their needs could be provided in the community had they been reviewed for eligibility as a member of the *Rolland* class.

23.     I used a similar process and criteria to review two of the Individual Plaintiffs who were rejected or delayed by the UMASS Eligibility Unit for the MFP waiver. I reviewed the records, and met with, Mr. Grant and Mr. Caouette at their nursing facilities. Based upon my experience at DDS, and particularly with transitioning *Rolland* class members, I believe that both of these individuals could be served in the community. I have been involved in arranging services and supports for people similar to Mr. Caouette. Mr. Grant will, however, present significant challenges in arranging services and supports to meet his complex medical, physical and behavioral needs. However, with support and oversight from EOHHS, DDS successfully created several residential settings with intensive medical and nursing services, physical accommodations with specialized medical equipment, and trained clinical staff to serve individuals with very complex needs who were transitioning from specialized nursing facilities. These programs, or similar ones, would be appropriate for Mr. Grant.

**VI.   Information about the MFP Waiver Program**

24.   Even though the base number of waiver slots increases modestly each WY (at most 60 additional MFP-RS slots per WY), EOHHS makes no effort to provide information about these waivers, and to conduct a meaningful In-Reach/Out-Reach effort for the MFP waivers which would give notice to members of the target group to submit timely applications to the UMASS Waiver Unit, in order to secure a waiver slot.

25.   In order to get an accurate understanding of the demand for residential services and supports offered through these MFP waivers, the Commonwealth must have a well conceptualized and implemented In-Reach/Out-Reach program that offers information, education, and practical opportunities to nursing facility residents about available services in the community.  This program must include a meaningful service coordination capacity that can establish ongoing relationships with each resident, support choice, engage with family and guardians, provide peer support, assist in gathering documentation needed for UMASS to make an eligibility determination and effectively address concerns in a proactive way.  The elements of this program must be far more intensive, proactive, and responsive than the current Options Counseling program provided to nursing facility residents through the Aging Services Access Points (ASAPs), which primarily is limited to responding to requests from residents who have already determined they want to leave the nursing facility.  It has no out-of-facility component to provide opportunities to visit community programs, engage in community activities, or simply better understand what life outside of a nursing facility would be like.  It does not engage nursing facility residents broadly to ascertain and encourage their exploration of receiving services in a community setting.  A more comprehensive In-Reach/Out-Reach service would reduce the number of applicants deemed ineligible due to insufficient documentation provided for the

eligibility review -- which was 163 applicants for the five waiver years -- and further clarify the extent of demand for the MFP-RS waiver program.

26.     In the *Hutchinson v. Patrick* Settlement Agreement on behalf of people with acquired brain injuries in nursing facilities, when EOHHS was receiving few applications to the ABI-RS and ABI-CL waiver programs that it developed to meet its Settlement Agreement obligations, EOHHS created a new and more effective In-Reach/Out-Reach program to inform people with ABI in nursing facilities about services available in the community. The program was successful in informing and encouraging more waiver applications. But this program, like its predecessor developed under the *Rolland* Settlement Agreement, has not been extended to people with other disabilities in nursing facilities such as those in this case. As a result, there is no systematic method for informing people of the benefits of community living, establishing ongoing supportive relationships, engaging with them and their families through peers who have successfully transitioned, exposing them to community living options, allowing them to participate in community activities, addressing concerns or fears with transition, and accommodating the effect of their disabilities on the choice-making process. Such a program would certainly increase the number of waiver applicants, provide residents with an informed choice about receiving services in the community rather than in a nursing facility, and provide a clearer representation of the demand for services in the community through the waivers.

**VII.    The Capacity of the MFP Waiver Programs**

27.     For the MFP-RS waiver, from April 2015 through March 2020, 852 individuals applied for a waiver slot but were rejected because there was no available capacity. *See* Affidavit of Karen Detmers, Appendix A. It is important to emphasize that these applicants applied without the presence of a viable In-Reach/Out Reach Program. Had such a program

existed the number of individuals would have been much higher. Even with the very limited choice options that do exist, applicants found ineligible due to waiver slots being full comprised of 60.1% of the total MFP-RS ineligibility decisions for that period. These data indicate a high demand for MFP-RS services well beyond the slots made available in each WY.

28.  The data provided by EOHHS demonstrates clearly that there is a significant unmet demand for MFP-RS and MFP-CL waiver services. *See* Affidavit of Karen Detmers, Appendix A. There were 1,786 applicants for the MFP-RS waiver, with 79.2% determined to be ineligible—nearly two-thirds of whom (60.1%) were found ineligible due to waiver slots being full. *Id.* This strongly indicates that there is an unmet need for more waiver slots to provide community residential services and supports and address the needs and preferences of individuals in nursing facilities. Furthermore, it is important to note that although 93 individuals were found eligible for MFP-RS services in WY 2020, only 28 (or 30%) actually transitioned to the community. *Id.* This demonstrates significant delays, inefficiencies, and administrative barriers in providing the community services funded under the waiver program. It is extremely disappointing that 65 eligible individuals continued to languish in nursing facilities years later, despite their being eligible for MFP-RS waiver services. *Id.*

29.  Moreover, by declaring that waiver slots are full, then denying eligibility on this basis, and requiring all rejected applicants to re-apply the following April of each WY allows EOHHS and its Waiver Unit to inaccurately claim there is no waiting list.

## VIII. Conclusions

30.  Based upon my professional experience in administering disability service systems, my role and responsibilities in transitioning and/or providing leadership that enabled nearly two thousand individuals with disabilities to leave nursing facilities and move to

community settings as part of the *Ricci*, *Rolland*, and *Hutchinson* cases, and my review of EOHHS waiver and choice programs that serve people with disabilities in nursing facilities, I believe that:

1. The administration of the MFP waiver, and its prioritization of people already served by DDS, DMH, and MRC denies qualified people with disabilities in nursing facilities the opportunity to promptly transition to the community;

2. The limited capacity of the MFP waiver, and the administrative denial of eligibility due to lack of capacity denies qualified people with disabilities in nursing facilities the opportunity to promptly transition to the community;

3. The restrictive and subjective eligibility criteria used by UMass and MRC to deny eligibility, as compared to DDS' experience in *Rolland* and *Hutchinson,* denies qualified people with disabilities in nursing facilities the opportunity to promptly transition to the community;

4. Community programs are usually far safer and more appropriately meet the assessed needs of individual applicants than nursing facilities; and

5. The Options Counseling process used by the Executive Office of Elder Affairs, (EOEA), as compared to the MRC and DDS informed choice process used in *Rolland* and *Hutchinson,* denies qualified people with disabilities in nursing facilities the opportunity to promptly transition to the community.

Based on my professional experience and personal knowledge, EOHHS previously has demonstrated that it can develop and provide residential and other services to people in nursing facilities with IDD and ABI, including those with complex medical needs, in order to allow them to transition to integrated community settings. But based upon EOHHS own data and

my personal knowledge, it is clear that the Commonwealth is not doing so for other people with disabilities and complex needs who remain stuck in nursing facilities.

Signed under the pains and penalties of perjury, this 14th day of April, 2023.

*Randall Webster*
Randall Webster