# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN SIMMONS; | ) | |
| DAVID MARSTERS, | ) | |
| by his next friend, Nancy Pomerleau; | ) | |
| LORRAINE SIMPSON, by her guardian, Sara Spooner; | ) | |
| SHERRI CURRIN, by her guardian, Sara Spooner; | ) | |
| CAROLE CHOJNACKI, by her guardian, Sara Spooner; | ) | |
| RICHARD CAOUETTE, by his guardian, Sara Spooner; | ) | |
| DONALD GRANT, by his guardian, Sara Spooner, | ) | |
| on behalf of themselves | ) | |
| and other similarly situated persons; and | ) | |
| MASSACHUSETTS  SENIOR ACTION COUNCIL, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. |
| | ) | 1:22-cv-11715-PBS |
| v. | ) | |
| | ) | |
| MAURA HEALEY, in her official capacity | ) | |
| as Governor of the Commonwealth of Massachusetts; | ) | |
| KATE WALSH, in her official capacity | ) | |
| as Secretary, Executive Office of Health and | ) | |
| Human Services; | ) | |
| MATTHEW GORZKOWICZ, in his official capacity | ) | |
| as Secretary of the Executive Office of Administration | ) | |
| and Finance; | ) | |
| ELIZABETH CHEN, in her official capacity as | ) | |
| Secretary, Executive Office of Elder Affairs; | ) | |
| and MICHAEL LEVIN, in his official capacity | ) | |
| as Assistant Secretary of MassHealth, | ) | |
| | ) | |
| Defendants. | ) | |

## INITIAL AFFIDAVIT OF BARBARA PILARCIK, R.N.

I, Barbara Pilarcik, hereby state as follows:

## I.    Purpose

1.    I was asked by counsel for the Plaintiffs to review the conditions, needs, and

preferences of the Individual Plaintiffs, in order to address six questions: (1) if each is

appropriate for transition to an integrated setting in the community; (2) if each needs residential

services and supports to live in the community; (3) if each wants to leave their current nursing

facility; (4) if each was provided sufficient information prior to this lawsuit to make an informed

decision about residing in the community; (5) if rejected for a community waiver program, could

the plaintiff nevertheless live in the community with appropriate supports; (6) if mentally ill, did

the Individual Plaintiff receive an appropriate Preadmission Screening and Resident Review

(PASRR) evaluation and receive needed specialized services.

## II.    Qualifications and Experience

2.    I have been a licensed registered nurse since 1963, serving people with complex

needs.  I have over 40 years of experience in the field of Intellectual/Developmental Disability

(I/DD).  My nursing experience includes working in general, psychiatric, and obstetrics

hospitals; in school and camp nursing; and for the Commonwealth of Massachusetts, Department

of Mental Health.  Most recently, I was employed for 32 years by Pathlight, formerly known as

The Association for Community Living, a private, non-profit agency providing intensive

community-based residential services to people with disabilities leaving institutional settings in

western Massachusetts.  I served as the Executive Director of Pathlight for 8 years; I retired in

2016.

3.    Pathlight was founded in 1952 by five mothers who were determined that their

children would not need to leave their families and community in order to receive care specific to

their needs, and believed that other children would also benefit from their efforts.  Pathlight

today provides services throughout the four counties of Western Massachusetts.  Pathlight has

over 20 group homes that each serve between two and five individuals; the residential programs

provide staffing and services 24 hours a day, seven days a week.  The services are based upon

each person's individual needs to achieve as much independence and self-determination as

possible.  In addition to the over 100 people served in the group home model, Pathlight also serves over 200 people in a Shared Living, or Host Home model.  Individuals live with host families of their choosing, or with their biological family, and also receive services based upon their needs and preferences.  Pathlight has a large and active family services system, serving over 1,000 families, and provides social and recreational activities, including a creative arts program, transition services, pre-school programs, and family support groups.  The family services program recently moved into a large, multi-use space in Northampton.  Pathlight also operates a regional autism center, known as Autism Connections, which serves over 1,500 individuals and their families.  In addition to Autism Connections, Pathlight serves individuals on the autism spectrum in residential settings, both group home and shared living.  Pathlight has a behavioral treatment approach, directed by a psychologist, guiding the staff in these homes.

4.     Pathlight opened the first Intermediate Care Facilities for Individuals with Intellectual Disabilities in Massachusetts over 30 years ago.  This federally-funded program uses home and community-based (HCBS) waiver funding to provide active treatment to individuals with I/DD who also have complex medical needs.  Today, Pathlight also serves individuals with complex medical needs in specialized homes – all with federal waiver funding.  Pathlight has 31 people in five specialized homes, all of whom have medical complexities, including tracheostomies, feeding tubes, implantable devices, customized wheelchairs, continuous oxygen, diabetes, serious seizures disorders, and rare conditions such as mitochondrial disorders.  One of the homes has been designated to serve individuals who require mechanical ventilation to breathe.  At all times that I led Pathlight, it met all relevant state and local licensing and regulatory requirements for active treatment and quality care.

5.      I have many years of practical experience in planning, developing, evaluating, and delivering a range of services to individuals with disabilities, including those with complex medical and behavioral needs.  In addition to being the Executive Director of Pathlight, I have also been an expert consultant to help monitor settlement agreements in ADA systemic reform cases in Virginia and the District of Columbia.  I was an expert witness and testified in federal court in the *Rolland v. Patrick* case in Massachusetts, a lawsuit that affirmed the rights of individuals with I/DD in nursing facilities to receive active treatment in nursing facilities and appropriate services in the community.  I was a reviewer for the Quality Service Reviews in an ADA case involving individuals with disabilities in nursing facilities in Texas from January 2015 until October 2015.  I have evaluated services for individuals with disabilities and complex health needs for over 15 years.

6.      I have consulted on services for people with I/DD in Georgia, New Mexico, and Idaho.  I also conduct mortality reviews as a consultant for Columbus Medical Services, a national consulting organization that provides clinical and technical assistance to state disability agencies.

7.      I have presented at local, state, national, and international conferences on various topics, including transition planning, supporting people during hospitalization, quality systems, safe practices, and shared living services.  I have worked with organizations throughout the United States and as far away as China and Azerbaijan.  I worked collaboratively with other leaders in the field to respond to an article in the *Journal of the American Academy of Pediatrics* to emphasize the importance of family-based services for children with I/DD and serious medical conditions.  I received funding from the Massachusetts Developmental Disabilities Council to publish a manual titled *Supporting Individuals with Mental Retardation during Hospitalization.*

The manual has been distributed throughout the United States and Canada and is part of the Quality Mall, an online resource of best practices. I served on the Massachusetts Department of Developmental Services strategic planning committee on health care. This committee implemented new policies and processes to support the health care needs of individuals served by the Department. The materials we developed have been used by other states. I have been the President of several local and state organizations in the human services field, and I am currently a member of the Public Policy Committee of The Arc of Massachusetts and immediate past member and treasurer of the Board of Directors of the Corporation for Independent Living (CIL). CIL is a non-profit housing agency that has developed hundreds of homes for individuals with disabilities in Connecticut and Massachusetts. I also served for ten years on the Ethics Committee of the Baystate Medical Center.

8.      My experience in providing services to individuals with disabilities and complex health conditions over the past 36 years has proven that habilitative and treatment services in the community help formerly institutionalized individuals attain skills and prevent or slow regression of skills. I have developed programs specifically for people transitioning from nursing facilities. These individuals have many complex medical needs, and many have been in an institution for most of their lives, often entering when they were children. There were no other options, and the families often stayed involved with them. For example, we served one man who had a tracheostomy, a g-tube, and a pacemaker, and who was very tight with muscle spasms and had repeated respiratory infections. He had lived with his family until the care needs became too great and then was placed into a facility. At one point, during a hospitalization for pneumonia, he was given last rites. With a comprehensive plan of care that included nursing support, physical therapy, a nutritionist, a massage therapist, and highly trained and skilled direct

support staff, we were able to keep him out of the hospital for the next 25 years.  It was the daily,

consistent, and skilled care of our staff and their ability to recognize and quickly respond to any

change in status that allowed him to live an active life, including a dream trip to Disneyworld,

tracheostomy, oxygen, feeding tube pump and all.

9.      My experience encompasses direct service, nursing care, policy development,

program design, evaluation, management, and systems change in the field of disability services.

## III.    Methodology

10.     Based upon the six questions I was retained to answer, as described in Paragraph

1, above, I worked with the Plaintiffs' counsel to determine the process for conducting my

reviews of the Individual Plaintiffs.  All of the Individual Plaintiffs and their guardians or next

friend agreed to meet with me.  I met with the Individual Plaintiffs in person at their place of

residence at the nursing facility.  I met with the guardians and next friend either by Zoom or

through telephone calls.  If necessary, I had follow-up phone calls if I felt I needed more

information.  I determined relevant staff and requested meetings with those staff, including social

workers and/or program directors.

11.     Records were provided by the Plaintiffs' counsel through a secure web portal, and

I requested any additional records I determined important to my review.  I read records on each

of the Individual Plaintiffs, including  PASRR reviews; community service eligibility

determinations; appeals and their outcomes; physician notes, including specialists such as

psychiatrists or counselors; nursing progress notes; history and physicals; social work notes;

notes from clinical specialists such as occupational therapy and nutrition; physician orders and

medication records; laboratory and diagnostic studies; assessments and daily logs; and any other

records included in the secure file.

12.     I also reviewed the regulations and community service program descriptions relevant to the Individual Plaintiffs.

13.     After reviewing the information and conducting the interviews, I synthesized the information on each of the Individual Plaintiffs in order to answer the six questions outlined above.  Based upon my experience and knowledge, I formulated an opinion on each of the questions for each of the Individual Plaintiffs.  I then calculated the aggregate of those answers for the group of seven Individual Plaintiffs.

## IV.    Summary of Clinical Findings

14.     Based upon my extensive review and individual findings of each Individual Plaintiff, my aggregate conclusions are:

(a)     Seven of the seven Individual Plaintiffs can be served in the community with appropriate supports.

(b)     Seven of the seven Individual Plaintiffs need residential services to live in an integrated setting in the community.

(c)     Seven of the seven Individual Plaintiffs want to leave the nursing facility and live in the community.

(d)     For the two Individual Plaintiffs who were rejected from the Moving Forward Plan (MFP) waiver, based upon my experience serving similarly challenging people in the community, both could be served in the community with waiver services and supports.

(e)     Prior to this litigation, six of the seven Individual Plaintiffs were not provided information and experiences to make an informed choice about leaving the nursing facility.

(f)    For the six Individual Plaintiffs who were identified with mental illness, six were not properly evaluated consistent with PASRR requirements and are not receiving needed specialized services.

## V.   Discussion of Each Individual Plaintiff

### A.   *John Simmons*

15.    John Simmons is a seventy-four-year-old African American gentleman who resides in the Rehabilitation and Nursing Center of Everett, Massachusetts.  I visited with Mr. Simmons on March 7, 2023, and met with him in an open conference room area on one of the floors of the nursing facility.  He was seated in a wheelchair, was dressed appropriately for the environment, and was clean and neat.  He greeted me pleasantly and was cooperative and articulate in describing his situation and what he would like for the future.  Despite the fact that he had received a chemotherapy treatment on the previous day, he was able to fully participate in the interview.

16.    Mr. Simmons stated that he would very much like to leave the nursing facility and live in an apartment or similar independent setting.  He described his preferred living arrangement as a one-bedroom, wheelchair-accessible ground floor apartment or an apartment in a building with an elevator, on a bus route and with public transportation.  He was able to describe the specific location in the Greater Boston area as either Roxbury, Cambridge, Somerville, Chelsea, Everett, or East Boston.  It is very important to him to remain close enough to Mass General Hospital (MGH) and Dana Farber in order to continue care with his current physicians.  He likes to do his own shopping, preferably at Market Basket, and can utilize public transportation by himself so long as he is able to obtain an electric scooter.

17.    Mr. Simmons attends some of the social activities at the nursing facility; his most preferred activity is to play chess online against the computer.  He does not leave the nursing facility except for medical appointments at either MGH or Dana Farber due to the cessation of all outside activities by the nursing facility because of the pandemic.  For fresh air, he goes to the enclosed patio, although the facility does not allow any resident to access it alone and there is often not enough staff to be with him.  In addition, the patio is used for those who smoke, and he cannot be around smoking due to his Chronic Obstructive Pulmonary Disease (COPD).  He stated he has one friend at the facility but that nearly everyone is not able to talk or carry on a conversation.  He is very capable intellectually.

18.    Mr. Simmons was admitted to the nursing facility on March 8, 2019, from MGH. His admission to MGH occurred as a result of suicidal ideation with a plan to overdose.  His depression was determined to be situational, and he also describes it as situational, due to a difficult living situation with a family member.  He had a previous suicide attempt in 2010.  He also has diagnoses of COPD, HIV, Type II Diabetes Mellitus, chronic embolism and thrombosis, hypertension, hyperlipidemia, liver cancer (recent), and a past history of opioid dependence.  He contracted COVID in December 2022, which he described as a mild case that was treated with medication.  He uses oxygen, through a nasal cannula, and a wheelchair for distances due to his COPD.  He has blood sugar checks three times a day and receives insulin based upon the blood sugar readings.  The nursing facility conducts assessments in the areas of fall risk, skin integrity, self-administration of medications, bed rails entrapment, bowel and bladder, elopement and AIMS (Abnormal Involuntary Movement Scale, for side effects of psychotropic medications). He receives two psychotropic medications.  His medical conditions are appropriately treated, he has regular physician and specialist visits, laboratory studies and diagnostic testing, and he is

described as stable.  He is regularly seen at the MGH HIV clinic and has a close relationship

with the physician who also advocates for him.  He is a full code, meaning that he wants all

measures taken to keep him alive, in case of a sudden medical emergency.

19.    Mr. Simmons had a PASRR Level II evaluation done at admission, and it was

determined that he did not have a serious mental illness, qualified for nursing facility placement,

and specialized services were not required.  A later PASRR Level II was done on December 5,

2022, and made the same conclusions and added that community services should be explored.  A

status review PASRR was done on January 23, 2023, and drew the same conclusions.  He was

denied approval for the home and community-based Acquired Brain Injury (ABI) waiver on July

5, 2022, due to not having an acquired brain injury.  He was approved for Moving Forward

Program – Community Living (MFP-CL) waiver on July 1, 2022, but still has not left the nursing

facility due to a lack of residential supports through a subsidized housing unit.

20.    Mr. Simmons was seen by a Mystic Valley Elder Services Options Counselor in

June 2022.  They offered him two housing proposals, one in Roxbury and one in Charlestown,

which he declined because one was not safe and the other was an assisted living facility which

Mr. Simmons believed would be "just like living at the nursing facility."  He was also offered a

housing opportunity in Williamstown several years ago, and he declined due to the distance from

his physicians.  He has been given two more housing applications and is in the process of

submitting them, though one application is to get on a state-funded Massachusetts Rental

Voucher Program (MRVP) voucher wait list where the wait list is "closed."  The second is a

two-bedroom accessible apartment in Roxbury which is one and a half blocks from a bus line,

which Mr. Simmons has said that he would be interested in.  Approximately one month ago, a

Massachusetts Rehabilitation Commission (MRC) counselor began visiting or calling him every

two weeks.  Should appropriate housing become available, the MRC counselor will assist him

with obtaining an electric scooter, furnishings, and an oxygen concentrator.  As of one month

ago, he was visited by a Department of Mental Health (DMH) case manager.  The case manager

visited him, asked many questions, but indicated to Mr. Simmons that he does not think that Mr.

Simmons will be found eligible for DMH services because "he is too independent."  Except for

the involvement of Mystic Valley Elder Services beginning last year, all of the outreach and case

management services started within approximately the past month, despite the fact that he was

admitted to the nursing facility in March 2019.

21.     Based upon my review of his records, a face-to-face visit with Mr. Simmons in

the nursing facility, and my experience and knowledge, it is my expert opinion that Mr. Simmons

can be adequately served in a residential setting in the community with appropriate supports, that

the determination of approval for the waiver is correct, that Mr. Simmons desires to live in the

community and that he does not, at this time, appear to have a mental illness.

   B.    *Carole Chojnacki*

22.     Carole Chojnacki is a sixty-seven-year-old White woman who resides at the

Rehabilitation and Nursing Center in Everett, Massachusetts.  She was admitted to the nursing

facility on April 4, 2022.  According to clinical records, she is divorced and is the mother of at

least two or possibly three adult children.  Reportedly, they are estranged from her.  I met with

her at a private conference room at the nursing facility.  She used a walker to enter the room and

was dressed in slacks and a matching shirt.

24.     When I asked Ms. Chojnacki if she would like to leave the nursing facility, she

said she would.  She said she would like to live in a group home, with a few other people, and

would like support from staff that are "trustworthy and good people."  She would like help with

housecleaning and social/recreational activities.  At times it was hard for her to remain focused on her answer to a question, and she would provide information unrelated to the question, but with redirection she would answer the question.  She said that she does not like one of her medications, Invega, which makes her feel "bad."  She is not sure why she needs to take it.  She said she met with agency staff to discuss a vacancy in a group home, but the provider subsequently declined to serve her.  She was recently accepted by another agency and is scheduled to move to the community later this month.

25.    Ms. Chojnacki was admitted to the nursing facility from Holy Family Hospital in Haverhill.  She was admitted to Holy Family Hospital in Haverhill on September 2, 2021, from Lakeview Rest Home, due to agitation and mania, including flight of ideas, delusions, paranoia, and chronic auditory hallucinations.  She has had numerous inpatient psychiatric admissions from 2013 to her most recent one at Holy Family Hospital.  In between her inpatient stays, she lived independently in the community or in a rest home.  She received Psychiatric Assertive Community Treatment (PACT) services from 2003-2017.  The records state that her pattern is to stop taking her medications and then she gradually decompensates to the point of needing inpatient treatment.  It does not appear that she ever lived in a residential group home or received other DMH residential services.

26.    Ms. Chojnacki has diagnoses of paranoid schizophrenia, Bi-Polar disorder (BPD), COPD, Type II Diabetes Mellitus not insulin dependent, anxiety disorder, unspecified psychosis, Chronic Kidney Disease stage 3, morbid obesity, emphysema, hyperlipidemia, insomnia, muscle weakness, and cognitive communication deficiency.  She receives three psychotropic medications by mouth and one psychotropic by muscle injection (Invega).  She is treated for her other diagnoses and sees specialists in the areas of gastroenterology, endocrinology, urology,

ophthalmology, podiatry, and psychiatry.  She needs some assistance with her personal care.  In addition to the walker, the records indicate that she uses a cane to assist with mobility.  She is a full code patient.

27.     Ms. Chojnacki participates in some of the activities provided within the nursing facility, but the nursing facility does not provide any outside activities due to the pandemic.  She only is able to go to an enclosed patio during the three times daily smoking schedule.  Ms. Chojnacki has a guardian, Sara Spooner, who was appointed in April 2022.

28.     Ms. Chojnacki had a PASRR referral on October 12, 2021, which determined that she has a serious mental illness, that the nursing facility is appropriate to meet her needs, and that she does not require specialized services.  It goes on to state that nursing facility placement "appears to be appropriate given the lack of resources or placements available to her in the community that can meet her needs safely within safety and stabilization."

29.     Ms. Chojnacki had a second PASRR determination on October 26, 2022, by DMH, which affirmed that she has a serious mental illness, and that admission to a nursing facility is appropriate, but concluded that she needs specialized services of individual psychotherapy.  The PASSR Evaluation states that barriers to living in the community are her state of homelessness and the inability to live safely and independently in a non-structured environment.  It goes on to recommend community-based waivers through MFP and DMH services.

30.     After the filing of this lawsuit, Ms. Chojnacki was referred to the HCBS MFP-RS waiver, and she was deemed clinically eligible on December 15, 2022.  There was a meeting on the day of our visit with an assessment team from Waystone, a state-funded human service agency, which had an opening in a specific group home. There are four women currently living

there, so Ms. Chojnacki would be the final person.  She stated that she would be interested in living there.  Subsequent to my visit, on March 14, 2023, Ms. Chojnacki received a letter from Waystone refusing to serve her in their group home.

31.    The guardian's staff person, Jessie Mayes, indicated that Ms. Chojnacki has been approved for services with a DMH-funded agency for a different group home.  After being placed on a wait list, Ms. Chojnacki was recently informed that there now is a vacancy, and she can move to a new home in the community later this month.

32.    Based upon my review of Ms. Chojnacki's records, my face-to-face meeting with her, and my interview with her guardian's staff person, it is my expert opinion that Ms. Chojnacki can be served in the community with appropriate supports, and that the determination of approval for the MFP-RS waiver was correct.  The denial of services by Waystone is based upon her statements of non-compliance with psychiatric oversight and medication made at the assessment meeting and was for a specific group home with four individuals already living there. It is important to note that she does currently comply with psychiatric oversight on a monthly basis, that she takes her medication, and has now been accepted into a DMH group home with appropriate staff supervision.

33.    The PASRR evaluations of October 2021 and October 2022 both give the reason for continued nursing facility placement as "lack of available community resources."   Ms. Chojnacki has expressed that she would like to live in the community and needs support from an agency that specializes in serving people with her needs.  I agree with the PASRR determination that she requires specialized services of individual psychotherapy.  She would also benefit from specialized services of peer support, community activities, and possibly clubhouse activities.

34.     Ms. Chojnacki did not receive sufficient information about community options and services prior to the filing of this litigation on October 11, 2022.  The records indicate that, despite her residing at the nursing facility since April 2022, Ms. Chojnacki was not provided a DMH case manager until November 21, 2022, or an Individual Service Plan (ISP) until January 19, 2023.  The PASRR report that approved clinical eligibility is dated December 15, 2022.  Finally, it is significant that prior PASRR evaluations did not approve residential services due to lack of those services, not due to the specific characteristics of Ms. Chojnacki's mental illness.  This has left her in the nursing facility, forgotten until this litigation was filed.

*C.     David Marsters*

35.     David Marsters is a seventy-three-year-old White gentleman who resides at Hillcrest Commons, a nursing facility in Pittsfield, Massachusetts.  I visited with Mr. Marsters in a recreation/conference private space at the nursing facility on March 8, 2023.  I also spoke with Mr. Marsters' sister, Nancy Pomerleau, who is his Health Care Proxy (HCP) and next friend in this litigation, on March 6, 2023 and again on March 20, 2023.  Mr. Marsters was introduced to me by the Director of Behavioral Services, Kerry Dellea, who left us to meet privately.  Ms. Dellea and Jon King, Director of Social Services, met with me after Mr. Marsters had concluded the interview and left to go to his room.  Mr. Marsters spent nearly an hour speaking with me.

36.     Mr. Marsters was dressed very neatly in khaki slacks and a Philadelphia Flyers sport jersey.  He told me that khaki is his favorite kind of pants and that he likes the Flyers.  He also mentioned several other teams that he likes, and he mentioned the Terriers, of West Springfield, several times.  Of note, West Springfield was his childhood home; he still returns there with his sister, and he also lived in West Springfield independently as an adult.

37.    Mr. Marsters was very articulate and able to recall many specific details, including imitating multiple conversations with different people.  He would frequently mimic these conversations in detail, including imitating the other person and their tone of voice.  He could recall many of the places he has lived and talked about growing up with his parents and siblings in West Springfield.  He talked about living at Devereux School in Pennsylvania for his high school years and how he was "supposed" to marry a girlfriend, move to the country, and have two boys.  He also recalled working as a janitor for several years.  He said he went to a short-term residential respite house when someone caused him trouble at his apartment and then was "kicked out" of the respite house but does not know why.  From there he said he went to the hospital and then came here.  Although missing details, all of his recollections are substantiated in the client record.

38.    Mr. Marsters spoke fondly of his family, especially his sister Nancy, who he says takes care of him and will take him home for a few days to his childhood home in West Springfield.  He says she does a lot for him.  He recounted a fairly recent visit with a brother and began to cry as he recalled the visit.  He said he has two brothers but only one comes to visit.

39.    Although he said he likes some people and some aspects of the nursing facility, especially one of the staff who works with him, he is clear that he wants to leave the nursing facility and go home again and live in West Springfield.  He becomes tearful when talking about going home, or to his own apartment.

40.    Mr. Marsters was very firm about not liking going to the day program and would mimic voices telling him that he doesn't have to go if he doesn't want to go.  He becomes distressed when talking about the program and says he doesn't like it there.  He was attending the day program three times a week until several months ago when he began refusing to go.  He says

he likes going out with the staff person from a local autism program, which occurs once a week. At times he would become weepy, or raise his voice and stare intently, but could always be redirected to a calmer demeanor. He appears to engage in self-soothing behaviors and would say comforting phrases to himself or to me. After about an hour, he stated that he was tired and wanted to go back to his room. He politely asked our permission to leave, we said good-bye, and he promptly left.

41.    A review of his records shows that he was seen at the Child Guidance Clinic as early as age five and went to local schools until high school when he was enrolled at the Devereux Residential School in Pennsylvania until age 22. After graduation and until 2014, he was living independently in West Springfield, and was married and widowed. He worked as a janitor and was receiving outpatient services from a mental health agency, the Carson Center. He had a DMH case manager. After living independently until 2014, he lived in a group home for seventeen months, operated by Behavioral Health Network. According to the records, he physically aggressed against a staff person and was transferred on August 11, 2016, to the Baystate Medical Center emergency department and then transferred to the Lowell Treatment Center for psychiatric care. He was at the Lowell Treatment Center from August 12, 2016, until October 27, 2016, when he was transferred to Hillcrest Commons. Hillcrest transferred him to Sharon Hospital on July 14, 2020, for evaluation and treatment of a recent escalation of behavior. At admission his diagnoses were Bipolar disorder type 1, most recent episode without psychotic features, autistic disorder, an episode of hypersexual behavior, mild tremors, and mild intellectual disability. The admission notes that he was on high dosages of Prozac, Depakote, and Zyprexa. His medications were gradually reduced, and the tremors were treated with an anti-parkinsonian medication. His behaviors improved, and he was discharged back to Hillcrest

on July 28, 2020.  His discharge diagnoses were Bipolar disorder, hypomania, and autistic

disorder.  The psychiatrist recommended that he be evaluated by a neuropsychologist with a

specialty in autism.  He had an evaluation with a neuropsychologist on October 19, 2020, when

the autism diagnosis was confirmed.  He has remained on a locked unit at Hillcrest Commons

since his return from Sharon Hospital, although he did attend a day program in the community

from October 2021 to November 2022, when he refused to continue.  He recently began going

out once a week with an autism specialist which he enjoys very much.

42.    According to the Program Director of Behavioral Services and the Director of

Social Services, Mr. Marsters would be able to successfully live in the community, with

appropriate supports.  They describe his behavior as steady and that he can be easily redirected.

He has benefitted from the structured behavior program provided at Hillcrest. While he does not

directly engage other residents, he will participate in group activities, and they feel he would

benefit from more community engagement with the Autism Connections staff.  They state that he

is quite adamant about not returning to the day program and becomes upset when encouraged to

attend.  He was recently evaluated by a new psychiatrist to determine whether an existing

diagnosis of schizophrenia is accurate.  There has been question as to the accuracy of this

diagnosis by staff at Hillcrest, the psychiatrist at Sharon Hospital, and his sister.  He presents

with behaviors seen in people with autism.

43.    In late 2020, Mr. Marsters' sister/HCP applied on his behalf for services under the

MFP-RS waiver and the MFP-CL waiver, but both were denied due to the determination that Mr.

Marsters "could not be safely served in the community."  His sister/HCP appealed the findings,

and on March 1, 2021, the denial was upheld.  Since that time, he has been consistently vocal

about wanting to leave the nursing facility and live in the community, preferably West

Springfield.  While he stated to me that he likes aspects of the nursing facility, there are multiple references in the record to his unhappiness with living at the facility and on the locked unit.  In my interview with his sister, she stated that he has been referred to Berkshire Elder Services, Ad Lib for housing possibilities, and Becket Family Services.  He also has been referred to DDS.

44.    A PASRR Level II evaluation was performed on November 4, 2022, and it was determined that Mr. Marsters does not have a mental illness, that he qualifies for nursing facility care, and requires specialized services of a psychiatric diagnostic evaluation to determine whether he presents with a psychiatric diagnosis.  The PASRR also recommends the MFP-RS waiver and services through either DDS or DMH and notes that he would like to live in the community.  This PASRR contains the erroneous statement "that discharge from the nursing facility was attempted two years ago through MFP but David did not want placement."  Mr. Marsters' sister states that this is not true, that he was never offered a placement through MFP or any other means, that the MFP requests she filed in 2020 were denied in 2021, and that when she appealed, the appeal affirmed the denial.  This is a serious error that is directly contrary to Mr. Marsters' expressed wishes regarding community placement.  My review of the records did not reveal the source of this erroneous statement.

45.    Based upon my review of his records, a face-to-face interview with Mr. Marsters, two interviews with his sister/HCP, and a face-to-face interview with the Director of Behavioral Programs and Director of Social Services at Hillcrest, I am of the expert opinion that Mr. Marsters can be adequately served in the community with appropriate supports.  He requires residential services from a qualified residential provider, specifically a provider with experience in working with people with autism, in order to successfully integrate into the community.  While Mr. Marsters said that he liked aspects of the nursing facility, he also told me that he

wants to live in the community and there are multiple references to that preference in his records over more than six years at the nursing facility.  The most recent PASRR evaluation also recommends that he be referred to the MFP-RS.  With the exception of the day program, it appears that most of the recommendations and activity for community services have occurred after the filing of this litigation on October 11, 2022.  He has not been consistently provided case management and therefore has not received information or experiences that provide him an understanding of residential services.

46.    The PASRR determination letters of October 2, 2022, and February 10, 2023, both state that Mr. Marsters does not have a serious mental illness, affirm nursing facility care, state that more appropriate care may be in the community, and recommend specialized services. From my review of the records, it appears that Mr. Marsters would benefit from specialized services, in particular a thorough evaluation to determine whether he has or had schizophrenia or if he has autism.  These are distinctly different conditions and require very different treatments. Mr. Marsters has been in a nursing facility for more than six years, including two years of COVID lockdown, without a clear understanding of what underlies his behaviors.  If it is determined that he has autism, the lack of an appropriate behavioral approach, including community integration into an environment with less sensory stimulation, has been a grave disservice to him.  In addition to the specialized services of a psychiatric diagnostic evaluation, Mr. Marsters would benefit from more community outings with an autism specialist.  He would benefit from a behavior support plan developed and implemented by an autism specialist and with all staff trained on implementation of the plan.  Despite the rejection in 2021 of Mr. Marsters' application to live in the community, it is my expert opinion based on experience, including providing residential services for people with autism, that Mr. Marsters could be safely

served in the community.  He is very similar to other people with autism who are successfully

living in staffed residential settings, with oversight from a clinical autism specialist and with

staff trained to effectively and consistently implement an individualized behavior support plan.

Mr. Marsters clearly desires to live in the community and indeed, much of his "behaviors" could

also be interpreted as a strong aversion to his continued placement in an inappropriate setting.

     *D.*    *Lorraine Simpson*

47.     Lorraine Simpson is a sixty-three-year old Black woman who lives at Hermitage

Health Care in Worcester, Massachusetts.  She was admitted to the nursing facility on May 6,

2021 and has remained there for the past two years.

48.     Prior to her admission to the nursing facility, Ms. Simpson was admitted to the

UMass Memorial Hospital Emergency Department on March 3, 2021, where a psychiatrist

determined that she was unable to make complex health care decisions.  She was discharged on

April 9, 2021, to her daughter's home.  According to the UMass Memorial record, her daughter

then kicked her out of the home, causing Ms. Simpson to become homeless for a short period,

which resulted in a second admission to the UMass Memorial Emergency Department on April

11.  At one point Ms. Simpson eloped from the hospital, but returned and was admitted again on

April 17, 2021.  She was discharged on May 6, 2021, and subsequently transferred to the nursing

facility.

49.     Ms. Simpson's primary diagnosis for her hospital admissions was adult failure to

thrive.  She also had diagnoses of anxiety, chronic constipation, diabetes mellitus type II with

insulin treatment, diabetic foot ulcer, elevated cholesterol, and floaters in the visual field.  She

receives treatment every other month for the eye disease, and her vision has improved.  She was

hospitalized from January 29, 2022, until February 1, 2022, for osteomyelitis of the right great

toe.  She was treated with antibiotics and wound care and continued to see a podiatrist after discharge, every two months.  She also receives four psychotropic medications for anxiety, mood stabilization, and depression.

50.     During the UMass Memorial hospitalization, an Elder Abuse Protective Order was filed, and Ms. Simpson's daughter was removed as her health care proxy.  Due to continuing issues with this daughter, the nursing facility filed a No Trespassing order on June 7, 2022.  Ms. Simpson has a guardian, Sara Spooner, and is a full code patient.

51.     When I first met Ms. Simpson in her room, she was dressed appropriately and was clean and neat.  She proudly showed off her nails that she had just painted and said she was going to add some gold sparkles.  She was very pleasant and agreeable to talking, so we moved to a more private location as she has a roommate who was watching television.  She talked about growing up in Jamaica, and spoke fondly of her grandmother, who brought the whole family here after she obtained a job as a nanny for a wealthy family.  She said her son and his two children visit her regularly.  She said she loves to cook Jamaican food and likes to clean house and keep everything neat.  She said that she prays every day and reads scripture and that it helps her.

52.     Ms. Simpson explained that the people at the nursing facility are very nice to her, but that she very much wants to leave.  She made clear that she wants to regain her independence and stated that: "I want to be a grandmother to my grandchildren and hold them in my arms."  She talked about how much she would like to be able to cook her own food, take care of herself, and live in a home in the community.

53.     In addition to Ms. Simpson, I also interviewed her social worker at the nursing facility, who has worked with Ms. Simpson since her admission.  The social worker clearly

22

stated that Ms. Simpson could live successfully – in fact, would "thrive" – in a group home or a shared living home so long as it was not her family's home. The social worker said Ms. Simpson is sociable, does well in groups of people, takes pride in her appearance, and likes to shop and to make things. Ms. Simpson is fairly independent in all her activities of daily living but requires cueing and monitoring. She is ambulatory and does not need assistance with walking. The social worker felt that Ms. Simpson would be best served in the Worcester area, particularly in the city.

54.    I also interviewed her guardian, Sara Spooner, who stated that she believes the most appropriate setting for Ms. Simpson is a community residential program. The guardian noted that Ms. Simpson's cognitive abilities have declined since her admission to the nursing facility. She agrees with the social worker's assessment of Ms. Simpson abilities and sociable nature and thinks Ms. Simpson would benefit from a day program and more activities. She also stated that she believes Ms. Simpson has depression and would benefit from some behavioral health treatment.

55.    The most recent PASRR evaluation, completed on November 30, 2022, determined that Ms. Simpson does not have a serious mental illness, but instead has dementia, which means that no further PASRR evaluations are required. The evaluation states that the reason for the nursing facility admission is 24/7 safety and security due to cognitive impairment. In addition, the evaluation also states that Ms. Simpson cannot be served in the community because "…needs exceed those which can be met in the community."

56.    Based upon my review of the records, my face-to-face interview with Ms. Simpson, interviews with her guardian and social worker, and my experience in serving people in the community for over thirty years, it is my expert opinion that Ms. Simpson can be served in

the community with appropriate residential services and supports.  I do not agree with the PASRR statement that her needs exceed those which can be met in the community; I have served many people who have far greater needs, including people with dementia, who have grown in ability and thrived.  I have served people with dementia as it progressed and led to their death.  I also did not have any problem in engaging Ms. Simpson in conversation; she was able to clearly respond to all my questions, was very articulate in telling me that she wants to leave the nursing home, and yet was able to recognize all they have done for her.  Ms. Simpson would benefit from a residential group home with nursing oversight to ensure that the gains made with her diabetes, including her eye complications, will continue.  She has unequivocally stated that she wants to leave the nursing facility and "be a grandmother to her grandchildren."  She would also benefit from specialized services while she is transitioning to the community.  She is very interested in more activities and would like to go shopping or do more group activities.  Her social worker said she would benefit from a day program.  I agree that leaving the nursing facility on a regular basis to interact within a social setting would also benefit her cognitive abilities.  Ms. Simpson has shown a remarkable ability to understand both what the nursing facility has done for her, and yet has remained clear that her fervent wish is to return to living in her own place, doing things that she loves to do, and being an integral part of her family.

   *E.*  *Richard Caouette*

  57.  Richard Caouette is a sixty-four-year old White man who lives at Bear Mountain at Worcester Nursing Facility.  He was admitted there on June 30, 2020, from UMass Memorial Geriatric Behavioral Health Unit with a diagnosis of dementia with behavioral disturbance.  According to nursing facility's records, Mr. Caouette worked as a laborer, was married and had one son, but he does not currently have any family involvement.

58.     According to his guardian, Sara Spooner, Mr. Caouette, had suffered a stroke and was much more debilitated with a tracheostomy for breathing, and a g-tube for nourishment, when he was first admitted to the nursing facility, but that he responded well to rehabilitation and improved substantially.  She also stated that prior to his stroke, Mr. Caouette lived in a rooming house, but he was evicted due to behaviors including heavy alcohol abuse.  He also suffered from falls at the rooming house.

59.     The nursing facility's medical assessment indicates that Mr. Caouette has non-insulin dependent Type II Diabetes Mellitus with peripheral neuropathy, adrenal insufficiency, hypothyroidism, asthma, chronic pain, and gastroesophageal reflux disease (GERD).  He suffered a fractured femur from a fall in June 2022 and was hospitalized from June 13- 20, 2022. He recently fractured his nose when he fell out of bed and was hospitalized at UMass Memorial Hospital from March 30-April 3, 2023.  He lacerated his right hand on September 30, 2021, when he punched a window.  Mr. Caouette currently is seen by Health Drive Behavioral Health and takes three psychotropics and one anticonvulsant medication.  He also sees a podiatrist, an orthopedic doctor, and had physical therapy and occupational therapy after his leg fracture.

60.     When I met with Mr. Caouette, he was lying in bed and had to be awakened. After putting in his hearing aids, he spoke with me.  There were several certificates on his bulletin board thanking him for being a veteran and for his service in the U.S. Army.  He likes the New England Patriots and enjoys watching football.   He told me that he is the youngest of nine children in his family.    He stated to me "I want to get out of here and get my own place.  It will be three years in June and that is too long."

61.     Mr. Caouette has a guardian, Sara Spooner, who stated that he clearly wants to leave the nursing facility and would benefit from a community residential placement, specifically

a group home with a few other men.  Ms. Spooner noted that Mr. Caouette is very capable with his personal care, primarily only needs cueing and monitoring, and is doing much better in the last six months. She stated that Mr. Caouette has very little to do in the nursing facility, cannot go outside, and spends most of his time watching television.  Despite his mental illness diagnosis, Mr. Caouette has never been served by the Department of Mental Health (DMH).  Ms. Spooner applied for a MFP-ABI waiver about a month ago but has not received any response.

62.    The nursing facility social worker expressed the view that Mr. Caouette clearly could be served in the community with appropriate supports, including psychiatric medication monitoring and nursing care for his diabetes and other health conditions.  She mentioned that she is very familiar with community placements as she worked for several years in a community agency providing group homes and has been a shared living provider, so her views about Mr. Caouette's ability to live safely and productively in the community are based upon her actual experience in serving other people with disabilities.

63.    A PASRR Level 1 was done on June 26, 2020, while Mr. Caouette was an inpatient at the Clinton Hospital Psychiatric Unit during his stay from June 18, 2020 to June 30, 2020 which determined that he had a serious mental illness.  A PASRR Determination Letter, dated June 29, 2020, contradicted that finding and stated that he did not have a serious mental illness and no further review was required.  There is no documentation to support this denial.  On July 29, 2022, Mr. Caouette threatened suicide with a belt, and was sent to the emergency room of UMass Memorial Hospital where he remained until August 3, 2022.   Subsequent to this event a PASRR Level 1 was done on August 1, 2022, which concluded that Mr. Caouette has a serious mental illness, that he is in need of a nursing facility, and that he would not benefit from specialized services. A PASRR Determination letter, dated August 5, 2022, contradicted this

finding and concluded that he did not have a serious mental and stated that while Richard has mental health diagnoses and impact on major life areas, he had no mental health treatment more intensive that outpatient treatment.

64.    The Progress Notes of February 2, 2023, show that the social worker sent the guardian an MFP application for two mental health agencies, South Middlesex Opportunity Council (SMOC) and Community Health Link (CHL).  To date there has not been a response to the application other than confirmation that it was received.

65.    Based upon my review of his records, my face-to-face interview with Mr. Caouette, and interviews with his guardian and his facility social worker, it is my expert opinion that the most appropriate placement for him is a community residential placement with appropriate supports.  He has clearly stated that he wants to leave and have his own place, his guardian believes he can be served in the community and has applied for waiver residential services, and the facility social worker also believes he can be more appropriately served in a community residential program.  He would benefit from specialized services while he is waiting for placement, as there is very little for him to do in the nursing facility.  He would enjoy going outside and engaging in community activities of his choosing.

*F.    Sherri Currin*

66.        Sherri Currin is a fifty-four-year old White woman who is a resident of Marlborough Hills Rehabilitation and Healthcare Center in Marlborough, Massachusetts.  She was admitted to the facility on March 23, 2022, from Clinton Hospital.  Prior to her admission to the nursing facility, Ms. Currin lived in Marlborough with her boyfriend of twenty years.

67.    According to the records I reviewed, Ms. Currin was brought to the emergency department of Marlborough Hospital on December 6, 2021, by her boyfriend, who stated that he

could no longer meet her care needs.  She was described as extremely unkempt, had not

showered in the last two months, and was not taking her medications.   She had also been

physically assaultive to her boyfriend.  Her admitting diagnoses were failure to thrive (adult),

depression, schizoaffective disorder, multiple sclerosis, and mild oropharyngeal dysphagia.

68.    A clinician at the Marlborough Hospital signed an emergency psychiatric

detention order for her transfer to the UMass Hospital.  The psychiatric staff at UMass evaluated

her and transferred her to Clinton Hospital on December 14, 2021, for further psychiatric care.

Ms. Currin remained at Clinton Hospital until March 23, 2022.  Her psychotropic medications,

Lexapro and Risperidone, were increased, Wellbutrin was added, and Amantadine was

continued. The behavioral health service at Clinton Hospital noted that Ms. Currin has a history

of substance and alcohol abuse and had been incarcerated for illegal drugs and prostitution.  Her

diagnoses were schizoaffective disorder with bipolar disorder, history of suicidality, and

probable mixed personality disorder with substance abuse disorder.

69.    While at Clinton Hospital, Ms. Currin was on the medical telemetry unit due to a

history of mitral valve stenosis, but she was not treated with medications.  She was

recommended for physical therapy three times per week for three weeks.  She had a rolling

walker to assist with mobility.  She received a CT scan of her head, but there was no evidence of

change in her multiple sclerosis.  Sara Spooner was appointed as her guardian with the authority

to consent to psychiatric medications (Rogers order).  Ms. Currin is a full code patient.

70.    Since her admission to the nursing facility just over a year ago, Ms. Currin was

hospitalized at UMass Memorial Hospital again on March 6-10, 2023, for ileus caused by severe

constipation.  Ileus is a painful obstruction of the intestine and/or the inability of the intestine to

move waste out of the body.  The UMass medical record indicates that the constipation was

caused by "too much time in bed". Ms. Currin also had a urinary tract infection which was treated with antibiotics. The ileus was treated successfully with a bowel regimen.

71.    I met Ms. Currin in her room at the Marlborough nursing facility. She was sitting in a chair next to her bed watching television. She remained very still and spoke in a low volume. Her affect was flat during much of the conversation, but at the end, her voice rose somewhat as she wanted to end the conversation. She said she likes that the nursing facility is helping her to walk. She stated that she wants to leave the nursing facility and wants to go back to an apartment with her boyfriend, who is making their apartment accessible and with a second bedroom. The boyfriend visits her every Sunday, and she very much looks forward to the visits. However, her boyfriend has stated that she cannot return to their home as he cannot provide the care she needs.

72.    During my interview with Ms. Currin, she was scratching at a rash on her abdomen, and I noted that she has tongue thrusting during her speech. The social worker stated that she had an abnormal movement evaluation, AIMS, done on March 25, 2023, in order to identify any adverse reactions to psychotropic medications.

73.    I spoke with her guardian's staff member, Jessie Mayer, who said that Ms. Currin is not doing any better and continues to spend a lot of time in bed. There was a period in June-July 2022 when Ms. Currin was less depressed, but she lapsed into her current state in September 2022. Ms. Mayer stated that Ms. Currin has very limited insight into her situation and does not understand that she cannot go back to her boyfriend's apartment. She has remained fixated on this idea and rejects any other community options, despite wanting to leave the nursing home. The guardian stated that Ms. Currin will sometimes participate in nursing facility activities, occasionally twice a week. Ms. Currin sees a psychiatric nurse practitioner once every two

weeks, which her guardian believes is not sufficient. Ms. Mayer is convinced that Ms. Currin would improve if she lived in the community in a residential program with appropriate structure and psychiatric treatment.

74.    I met with her social worker, Lynn Wilson, who said that she thinks Ms. Currin would "thrive" in a group home, but currently she insists on returning to her prior home with her boyfriend. Ms. Wilson also stated that if Ms. Currin was gradually was introduced to services, and began to understand what was available, she would have a better understanding of her options. Ms. Wilson stated that it is very difficult to get psychiatric services for people with Serious Mental Illness (SMI) and that DMH traditionally just "drops people with SMI off at the nursing facility." Ms. Mayer noted that all of the PASRR and DMH activity only began about a month ago, after Ms. Currin became a plaintiff in this case, and that until recently, Ms. Currin never had a DMH case manager and she was "lost to the system."

75.    A PASRR Level 1 was done on March 8, 2022, at Clinton Hospital prior to her admission to the nursing facility. It determined that she has a serious mental illness and is in need of nursing facility admission. She had a PASRR Level II done by DMH on April 13, 2022, which determined that she has a serious mental illness, requires a nursing facility, and does not need specialized services. However, that PASRR evaluation also recommended community residential services, including services through the MFP or ABI Waivers, a DMH group home, or a Group Adult Foster Care setting. The PASRR also concluded that Ms. Currin would benefit from a group home/supportive living arrangement through DMH. There was a second PASRR Level II done on August 3, 2022, which determined that Ms. Currin has a serious mental illness, that a nursing facility is *not* appropriate, that community services *are* appropriate, and that she does not require specialized services. She was referred to the local Aging Services Access Point

(ASAP) for transition assistance. She had a third PASRR evaluation on December 5, 2022, which determined that Ms. Currin has a serious mental illness, that she requires a nursing facility, but that placement in a community residential setting is more appropriate, and that she does not require specialized services. She had a fourth PASRR on January 13, 2023, which makes the same recommendations as the prior one.

76.     Based upon my review of the records, my face-to-face interviews with Ms. Currin, her social worker, and a telephonic interview with her guardian's staff person, Jessie Mayer, it is my expert opinion that Ms. Currin would be most appropriately served in a community residential program. Indeed, all of the four Level II PASRRs which have been done over the past year have made the same recommendation. Ms. Currin has repeatedly said that she wants to leave the nursing facility. Both her guardian and her social worker stated that a community residential setting is the most appropriate place for her to live.

77.     I do not agree with the recommendation of no specialized services. Ms. Currin needs on-going counseling to assist her in understanding the reality of her current situation. She needs to have a program of gradual introduction to services in the community so that she can begin to understand the options that are available to her. Ms. Mayer stated that she would work with her to visit services in the community and believes her boyfriend would also help her. While Ms. Currin currently is fixated on an option which is not possible, working with a DMH case manager and with a therapist would help her begin to process her situation. In addition, I recommend that Ms. Currin receive a psychiatric evaluation from a psychiatrist who is knowledgeable in treating refractory depression. Ms. Currin has had serious depression for over a year, with little to no improvement. A knowledgeable psychiatrist could evaluate her condition and determine if she would benefit from some of the newest, approved treatments. Finally, it is

clear that despite recommendations that a community placement is the most appropriate living arrangement for Ms. Currin, no activity occurred until after the filing of the litigation on October 11, 2022.

    *G.*   *Donald Grant*

**78.**   Donald Grant is a sixty-four-year old White male who is a resident of the Worcester Rehabilitation and Health Care Center in Worcester, Massachusetts.  He was admitted to the facility on May 29, 2021 from UMass Memorial Hospital in Worcester, MA.  Prior to his hospitalization at UMass Memorial, he resided at the Odd Fellows Nursing and Rehabilitation facility in Worcester, and prior to that, he was at UMass Memorial Hospital and then the Leominster Rehabilitation and Nursing Center.  He has also lived with his mother, who is now deceased.  He has two brothers and is estranged from them.  He is divorced and worked as a chef for many years, which form his fondest memories, inform his views of his physical condition and diet, and inspire him to want to leave the nursing facility.

79.   According to his nursing facility records, Mr. Grant had eight emergency department visits between May 20, 2021, and December 19, 2022.  He went to the hospital on May 20, 2021, from the Odd Fellows Nursing Facility for worsening diarrhea.  On May 29, 2021, he went to the UMass Memorial hospital emergency department due to his complaints of not receiving his insulin from nursing facility and believing he had hypoglycemia, and back pain. He was treated for hyperglycemia and then transferred to Worcester Rehabilitation and Health Care Center.  He went to the emergency department on June 16, 2021, for aggressive behavior, pursuant to an emergency detention order (Section 12).  Another emergency detention order transferred him to the UMass emergency department on April 27, 2022, for refusing to eat or drink, and again on May 10th for verbally abusing his roommate.  He went to the UMass

emergency department on October 30, 2022, for back pain; on November 12, 2022, for shortness of breath and on December 19, 2022, at his insistence for shortness of breath.

80.    Mr. Grant has diagnoses of personality disorder unspecified, anxiety disorder, major depressive disorder, bipolar disorder, Type II Diabetes Mellitus insulin dependent, spinal stenosis, low back pain, asthma, sciatica, sleep apnea, hypertension, GERD, hyperlipidemia, morbid obesity, overactive bladder, pain in right and left wrist, muscle weakness, paroxysmal atrial fibrillation, shortness of breath, and difficulty in walking.  He has been seen by specialists in rheumatology, neurology, podiatry, endocrinology, and an infectious disease clinic for urinary complaints.  His weight was five-hundred and forty-four pounds as of November 2022, since then he refuses to be weighed.  He has had physical therapy and occupational therapy for a limited time.  He is a full code patient.

81.    Mr. Grant takes three psychotropic medications for his behavioral health condition, and sees a psychiatric nurse practitioner from Health Drive Behavioral Health approximately monthly or more often, if requested.  The behavioral notes often refer to him as accusatory, angry, agitated, and anxious and indicate that he would benefit from behavior management.   The record did not indicate that he has a behavior management plan.  Sara Spooner was appointed his guardian on July 19, 2022.

82.    I met Mr. Grant in his room at the nursing facility.  He was lying on his back in a bariatric bed.  He had a C-Pap machine on which he took off while talking with me.  He says that it is very uncomfortable for him to sit up and lying flat on his back is his most comfortable position.  He has pain in his back and stated that he cannot use his legs.  He had a number of pictures in his room of his mother and of his dog and said he was close to both of them.  He said he does not see his brothers.  He was proud of his career as a chef but said it has given him some

problems with his wrists and shoulders.  He takes oxycodone twice daily for pain.  He said he very much wants to leave the nursing facility and would like to live in a group home.

83.    Mr. Grant needs basic dental care and showed me that he had several teeth missing.  He said nursing facility staff have told him that he cannot see the dentist in a stretcher and needs to be able to be in a wheelchair to be treated.  Mr. Grant is very unhappy with his diet, saying that he is not given any sugar-free desserts and that it is very difficult for him to lose weight.  He said he would very much like to lose weight and knows that it is making life much harder for him.  He stated that he had bariatric surgery and was able to lose weight, but he has regained it due to his lack of activity and diet.  He says he cannot get up into a wheelchair as his legs are too weak, but wants to get out of bed, be mobile, and be in the community.

84.    I also interviewed Sara Spooner's staff member, Bonnie Bedard, who stated that Mr. Grant very much wants to leave the nursing facility, and that he has twice been denied eligibility for the MFP waiver.  She stated that Mr. Grant responds differently to different staff and will cooperate with certain staff.  She confirmed that many of Mr. Grant's concerns with the lack of adequate care and treatment at the facility are valid and need to be addressed.

85.    Ms. Bedard also repeated how upset Mr. Grant is at his loss of independence and the lack of control he has over his life.  She noted that he does not participate in any nursing facility activities due to being bed-bound, but the activities director does visit him in his room.  Mr. Grant has a mobile telephone which he uses frequently to contact people in the community, including his guardian.  Ms. Bedard also said that she thinks he has been recently assigned a DMH case manager, which, despite his serious and persistent mental illness, has never happened in the two years since he has been in this nursing facility and only occurred after he became a plaintiff in this case.

86.    I also spoke with the nursing supervisor, Jacqueline Njuiri, RN, who stated that Mr. Grant does have issues with various staff and will call 911 if he feels he is not getting his medications or proper care.  Ms. Njuiri has encouraged him to talk with her directly or someone at the nursing facility about his complaints rather than calling the police.

87.    I also spoke with Jennifer Young, Activities Coordinator, who said that a community program would be more appropriate for Mr. Grant.  She stated that she thought Mr. Grant would be more motivated, engaged with caretakers, and could regain some mobility if he was in a community residential setting.  She also felt that Mr. Grant would be able to learn to manage his diabetes testing and medications, since he has been a diabetic since 1990.

88.    A PASRR Level I was evaluation was done on October 20, 2020, when Mr. Grant was admitted to the Odd Fellows Nursing Facility from UMass Memorial Hospital.  The DMH PASRR Unit determination letter, dated October 30, 2020, stated that he did not meet the criteria for a serious mental illness and no further review was required.  The PASRR Level II evaluation accompanying that determination notice and conducted by Yolanda Smith, Social Worker at the Odd Fellows Nursing Facility, reached the opposite conclusion.  She determined that he *did* have a serious mental illness of mood disorder, severe anxiety, paranoia, personality disorder, and substance abuse disorder.  In addition, she determined that all three major life activity areas have been negatively impacted by a serious mental illness.  It is inexplicable that the DMH PASRR unit ignored his mental illness and did not even address his need for specialized services.  In my opinion, this determination is not supported by the evaluation conducted by the nursing facility social worker or by his subsequent treatment history.  Moreover, a second PASRR Level 1I evaluation, done on August 1, 2022, found that Mr. Grant does have a serious mental illness, is in need of a nursing facility services, but is unable to benefit from specialized services.  This

latter conclusion is, in my judgment, plainly wrong given his two psychiatric admissions to UMass Memorial Hospital and the ongoing receipt of three psychiatric medications.  In my opinion, Mr. Grant would benefit from a behavioral management plan, efforts to engage him in specialized activities, and ongoing physical and occupational therapy.

89.    On January 10, 2022, Mr. Grant was twice denied waiver services through both the MFP and ABI residential waiver programs.  Both denials were based on the determination that he cannot be safely served in the community.  There is no information to indicate upon what factual information or other reasons formed the basis of this denial, but it is clearly contrary to the views of the nursing facility activities coordinator and Mr. Grant's guardian.

90.    Based upon my face to face interview with Mr. Grant, my interviews with his guardian, the activities coordinator, and the nursing supervisor, as well as my review of the records, it is my expert opinion that Mr. Grant would best be served by living in the community, with appropriate supports.  Mr. Grant has firmly maintained over his entire time at Worcester Rehabilitation and Health Care Center that he wants to leave the nursing facility and live in a group home.  His guardian stated that many of his behaviors are due to his living in the nursing facility.  The facility's activities coordinator said he would be more motivated if he lived in the community.  And the behavioral health notes in his records indicate that "institutional living" is a trigger for his behaviors.  I agree with these professionals and believe, based upon my experience serving individuals with complex medical needs in community residential settings that are specialized designed and equipped, that Mr. Grant could and should be safely served in the community.

91.    Moreover, I disagree with the determination that Mr. Grant does not need specialized services in the nursing facility.  There are multiple references in the record to his

diagnosis of personality disorder and yet he is not receiving treatment specifically tailored to this diagnosis. His anger, poor relationships, and lack of insight and judgement all are part of a personality disorder. Monthly medication reviews, while important, are not going to help him address these issues. He needs a psychiatric assessment from a clinician trained in evaluating and treating personality disorders. There are specific treatments for this diagnosis and if he does in fact have a personality disorder, he will not show improvement unless he obtains therapy from a skilled clinician. He is caught in a negative feedback loop – desperately unhappy with his living situation, experiencing near total loss of control and with very few resources to make positive changes in his life. In addition to a psychiatric assessment for personality disorder, he would also benefit from case management and education on the types of services available to him in the community. Since it is difficult for him to move about other than on a stretcher, this could begin by visits to the nursing facility with videos or similar information. His weight needs to be addressed from a physician specifically trained to work with people who have morbid obesity. A multi-pronged approach will help him see a future that he wants and will be motivated to achieve, so long as he gets the skilled supports he needs.

## VI.    Conclusion

92.    Based upon my professional experience in serving hundreds of individuals with significant disabilities in community settings, many of whom were transferred from nursing facilities or other segregated institutions, I believe that all of the Individual Plaintiffs are appropriate for transition to the community, can live in the community with residential services and supports, and want to leave the nursing facility. Based upon this experience, and the

findings for the Individual Plaintiffs, I believe that there are likely many other individuals with similar disabilities currently in nursing facilities who also can live in the community with appropriate residential services and supports.

Signed under the pains and penalties of perjury, this 14th day of April, 2023.

Barbara Pilarcik, R.N.