UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID MARSTERS, <br> by his next friend, Nancy Pomerleau; <br> LORRAINE SIMPSON, by her guardian, Sara Spooner; <br> SHERRI CURRIN, by her guardian, Sara Spooner; <br> CAROLE CHOJNACKI, by her guardian, Sara Spooner; <br> RICHARD CAOUETTE, by his guardian, Sara Spooner; <br> DONALD GRANT, by his guardian, Sara Spooner, <br> on behalf of themselves <br> and other similarly situated persons; and <br> MASSACHUSETTS SENIOR ACTION COUNCIL, <br><br> Plaintiffs, <br><br> v. <br><br> MAURA HEALEY, in her official capacity <br> as Governor of the Commonwealth of Massachusetts; <br> KATE WALSH, in her official capacity <br> as Secretary, Executive Office of Health and <br> Human Services; <br> MATTHEW GORZKOWICZ, in his official capacity <br> as Secretary of the Executive Office of Administration <br> and Finance; <br> ELIZABETH CHEN, in her official capacity as <br> Secretary, Executive Office of Elder Affairs; <br> and MICHAEL LEVIN, in his official capacity <br> as Assistant Secretary of MassHealth, <br><br> Defendants. | CIVIL ACTION NO. <br> 1:22-cv-11715-PBS |

**SUPPLEMENTAL AFFIDAVIT OF RANDALL WEBSTER**

I, Randall Webster, hereby state as follows:

**I.    Overview**

1. On April 14, 2023, I submitted an Initial Affidavit in conjunction with the Plaintiffs' Motion for Class Certification. In that Affidavit, I set forth my qualifications and experience, and opinions for each of the Individual Plaintiffs with respect to the standards,

1

process, capacity, and administration of the home and community-based services (HCBS) programs provided by the Executive Office of Health and Human Services (EOHHS), as well as the information and outreach provided to nursing facility residents by EOHHS.

2.  Among the several HCBS programs available to people with disabilities in nursing facilities, EOHHS has created different, and far more restrictive eligibility criteria for the Moving Forward Program/Residential Services (MFP-RS) waiver, which is the primary waiver program that currently is available to people in nursing facilities, regardless of their disability. I have been asked by the Plaintiffs' Counsel to review the eligibility criteria for this waiver and to compare it to the residential waiver criteria that EOHHS uses for people with intellectual and developmental disabilities (IDD), called the IDD Intensive Support waiver. I have also been asked to compare the systemic reforms requested in this case with those ordered by the court in two related, ADA nursing facility cases, *Rolland v. Patrick* on behalf of people with IDD, and *Hutchinson v. Patrick* on behalf of people with Acquired Brain Injuries (ABI). This Supplemental Affidavit sets for my findings on these issues.

**II.    Summary of Clinical Findings**

3.  In preparing this Supplemental Affidavit, I reviewed the Defendants' Opposition, the affidavits of Leslie Darcy, Amy Berstein, Melissa Guyer, and various waiver documents for the MFP and IDD waivers.

   A.   *Comparison of Moving Forward Program Residential Waiver (MFP-RS) and IDD Intensive Waiver*

4.  As described in the chart included as Attachment A, the clinical criteria for the MFP waiver and the IDD Intensive Support Waiver share some common characteristics. They both have the same age criteria, they both include a requirement that the individual need 24 hour per day supports, and they both have similar financial criteria (Medicaid-eligible). But there are

two significant differences: (1) to access the IDD Intensive Support waiver the person must have an intellectual disability, whereas there are no disability-specific limitations or diagnostic requirements in the MFP-RS waiver; and (2) there are no additional clinical eligibility requirements or risk factors for the IDD Intensive Support waiver, but there are separate clinical eligibility criteria, including a list of 10 safety factors, for the MFP waiver.

5. The ramifications from this second difference are significant. DDS does not refuse waiver services or reject a person with IDD who needs residential services based upon a risk assessment. In fact, DDS eligibility criteria do not require that the applicant be assessed for risk at all. Instead, if there is risk identified through the assessment and individual service planning (ISP) process — specifically, the Massachusetts Comprehensive Assessment Profile (MASSCAP) — DDS tailors services to the individual to address the risk as well as other identified needs. Ineligibility for DDS services, and specifically for the IDD Intensive Services Waiver, due to risk is not a consideration.

6. The opposite is true for the MFP waivers. As described in the Bernstein affidavit, a risk assessment, based upon the ten factors listed in ¶ 36, can (and often does) result in a denial of eligibility, even if an individual applicant meets the financial and all other eligibility requirements and is positioned in the queue prior to all waiver slots being filled.

7. The consequence of this requirement is that in the initial MFP waiver eligibility determination, "risk" can be a conclusive factor that excludes an applicant from all waiver services, while with the DDS Intensive Support and other waivers, risk factors are identified through assessments, and then addressed through alignment of the individual's needs with providers who have the demonstrated expertise to address the risk factor(s), including clinical expertise to assess and recommend particular services and supports that will mitigate the risk. In

the DDS risk process, risk assessments are incorporated in the client record system, together with provider and DDS Area Office risk plans. These plans are reviewed by the Regional Risk Committee and, in unusually challenging situations, by the Central Office Risk Committee.

8. Risk can generally be addressed and should not be an automatic disqualifier, as demonstrated by how risk is addressed in redeterminations. For all MFP-RS participants, an eligibility redetermination occurs one year after placement.[1] If a UMass nurse reviewer finds that the person cannot continue to be safely served in the community, the nurse usually recommends denial of continued waiver eligibility. But since, unlike the pre-enrollment clinical review, there now is a service provider and a DDS service coordinator assigned to the individual, the DDS MFP Regional Team, provider staff, and DDS risk management staff work together to keep the individual in services provided in the community. In the time I was associated with this waiver, service delivery adjustments, including seeking a different provider, were used to make sure the participant did not lose his/her waiver slot and return to a facility. I cannot recall there being anyone returning to a nursing facility because of risk. The process we used mirrored the DDS risk management process in the IDD Intensive Services waiver, including the commitment to community placement over institutional services.

    B. *The Systematic Reforms Ordered by the Court in Rolland v. Patrick and Hutchinson v. Patrick*

9. The injunctions entered by the court in both the *Rolland* and *Patrick* nursing facility cases included a number of similar provisions. These provisions were directed to multiple different agencies, including the Executive Office of Health and Human Services (EOHHS), MassHealth, UMass, the Department of Disability Services (DDS), and the

---

[1] EOHHS has assigned DDS the responsibility for managing, coordinating, and monitoring the MFP-RS waiver. People served by this program are served by the DDS residential provider network, subject to its licensing and oversight authority, and governed by its policies, procedures, and regulations.

Massachusetts Rehabilitation Commission (MRC). The orders required each of these agencies to take specific actions, expand programs, create new home- and community-based services, adopt rules, modify policies and eligibility criteria, seek legislative appropriations and approvals from CMS, develop monitoring and data reporting systems, and share responsibility for transitioning thousands of people with IDD and ABI from nursing facilities to community settings.

>       (1)     Both Orders required the transition of a specific number of individuals from nursing facilities to the community.

10.    The *Rolland* class included over 1,700 individuals with intellectual and developmental disabilities (IDD) in nursing facilities. The *Hutchinson* class included several thousand individuals with acquired brain injuries (ABI) in nursing facilities. Because of these large numbers, both court orders[2] required the transition of a significant number of people each year from nursing facilities to the community. In *Rolland* the two orders required that more than 1,700 individuals be transitioned from nursing facilities, while in *Hutchinson*, the two orders required that over 1,200 people be transitioned over several years. These numbers were the central element of compliance.

11.    In *Rolland*, *every* individual found eligible for DDS services left the nursing facility, unless the individual made an informed choice to remain in the facility. In that event, DDS provided each such person with specialized services that met the federal standard for active treatment, in addition to nursing facility services. As indicated in my April 14, 2023 Affidavit, the *Rolland* case, and all associated orders, was successfully dismissed in May of 2013, after over 1,700 individuals had been placed into community programs, most within the IDD Intensive Waiver. About 150 individuals with IDD remained in nursing facilities, with approximately 90

---

[2] In both cases, there were two separate court orders, each of which included separate transition placement numbers.

residing in pediatric nursing facilities.

12.     These placements were accomplished by setting annual transition targets for DDS of about 150 individuals per year, together with a requirement that all individuals who remained in facilities received active treatment through the provision of specialized services. Currently, due to a very effective DDS PASRR process, every nursing facility resident eligible for DDS services has an active plan to move out of the facility into the community, and while waiting to move, receives specialized services as required by the Level II PASRR Review.

13.     Under the *Hutchinson* orders, there was a commitment to develop two new waiver programs, the Acquired Brain Injury – Residential Services (ABI-RS) and the Acquired Brain Injury – Nonresidential Services (ABI-NS), and then to achieve full use of all these ABI waiver slots through a vigorous placement schedule to make sure all slots were filled by the end of the fiscal year, including the number of new slots (at least 125) that were added each waiver year. As a result of this commitment, the case and all remedial orders were successfully dismissed in September 2021. The number of waiver slots has continued to grow modestly each waiver year since disengagement.

   (2)     To implement both Orders, EOHHS had to increase the capacity of its <u>waivers</u>.

14.     Under the court orders, there was a need to add waiver slots each year to meet the demand for intensive waiver supports. This was done by increasing the slots available in the waiver year through the waiver application/waiver amendment to CMS.

15.     In order to implement these court orders, and ensure that between 125 – 200 people with IDD and ABI in nursing facilities were transitioned each year under each court order, there had to be a significant annual increase in the relevant residential service programs – mostly the IDD Intensive Supports waiver, and the ABI waivers – in order to allow nursing

facility residents to move to the community. These increases were annually funded through Legislative appropriations to comply with these Court orders. DDS, with approval from EOHHS and the federal government (CMS), sought and obtained a significant annual capacity increase to its Intensive Supports waiver during the implementation of the *Rolland* orders. Similar increases were requested and approved by CMS for the ABI waivers. Without these capacity cap increases, implementation of the orders would not have been possible. To my knowledge, CMS never refused to approve any waiver capacity requests.

> (3) Under the court orders, program criteria and procedures were modified to <u>serve all people in the class.</u>

16. Initially, during implementation of the first *Rolland* order, neither DDS nor its Intensive Supports waiver served individuals with developmental disabilities (DD). As a result, this subgroup of the class struggled to leave nursing facilities and were not able to access needed residential services and supports. Through new provisions included in the second *Rolland* order, DDS modified its service eligibility criteria, expanded its waiver coverage, utilized its existing residential provider network and community infrastructure, and was able to transition hundreds of people with DD to residential programs in the community.

17. DDS initially was reluctant to transition people in nursing facilities with complex medical or behavior conditions who might present substantial safety concerns, such as those needing a ventilator and a significant presence of nursing staff to support them in the community. But again, DDS modified and expanded its community programs to accommodate their significant medical needs in conjunction with cooperative providers capable of providing such services. DDS also supported individuals who had been designated as sex offenders by matching qualified providers who had shown competence in serving such people with the individual in the nursing facility.

18.     Similarly, under the initial *Hutchinson* order, the agency previously assigned to serve people with traumatic brain injuries, the Massachusetts Rehabilitation Commission (MRC), was ill-equipped to serve all people with ABI who needed residential services and supports. Even rather straightforward transitions were taking years. In response, under the second *Hutchinson* order, DDS modified its policies and practices to address the capacity shortcomings of the MRC system, expanded its service capacity, adapted its service provider network, revised its transition planning process, used its community service system infrastructure to provide residential services for eligible people with an ABI diagnosis in nursing facilities, and thus was able to transition any person with ABI in a nursing facility – regardless of the intensity of their medical, nursing, or behavioral needs – to the community. At the same time, MRC assumed responsibility for people with acquired — not just traumatic — brain injuries, providing residential supports, housing subsidies, home modifications, and other services to people with ABI who did not need to live in a 24-hour staffed residential setting, and began operating a new waiver – the ABI-Community Living (ABI-CL) waiver program.

19.     As a result of these modifications, the orders ensured that ALL applicants choosing community placements could receive services available to them through the waiver programs.

    (4) Under the court orders, waiver program service delivery was improved <u>through administrative and financial modification.</u>

20.     As described above, under both the *Rolland* and *Hutchinson* orders, DDS and MRC made extensive modifications to their waiver programs, eligibility criteria, service network, and community infrastructure, including agency rules, policies, procedures, and practices. Even when there were statutory limitations, lack of agency service delivery experience and expertise, or the lack of systems infrastructure for monitoring services and

supports, EOHHS made reasonable modifications to these limitations by establishing interagency agreements which allowed for the provision of residential services by DDS to people with DD and ABI, along with the blending of monitoring systems to make sure compliance with the court orders remained on target.

21. Specifically, EOHHS modified its policies, procedures and customary practices of service delivery and compensation. First, EOHHS requested that DDS, the state agency with the most experience in providing 24-hour care for individuals in the community, assume the responsibility for placing people needing residential services and supports through the new MFP-RS waiver and the ABI-RS waiver. DDS was authorized to provide these residential services pursuant to an Interagency Services Agreement (ISA) with MassHealth. It modified and expanded its incident reporting system, contracting, Medicaid claiming, electronic Individual Service Plan and Plan of Care processes to enable EOHHS to comply with a variety of service delivery requirements in the *Rolland* and *Hutchinson* remedial orders. In conjunction with EOHHS, DDS established a policy manual that required all licensing and certification provisions applicable to DDS' IDD system applied to ABI providers and waiver staff.

22. DDS also modified its service codes, billing system, and funding mechanisms to comply with the *Rolland* order provisions concerning specialized services required through the PASRR Level II review, ensuring that there was a means of providing specialized services to individuals residing in nursing facilities. It also did a full review of regulations to ensure that there would be service capacity to meet the annual placement targets.

(5) <u>Court-orders led to increased information, outreach and informed choice.</u>

23. Each remedial order required informing people residing in nursing facilities of their rights under the ADA and ensuring they fully understood the opportunities to receive

services outside an institution, in a community setting. Under the *Rolland* order, this was accomplished with an extensive In-Reach and Out-Reach program, a program that eventually was replicated under the *Hutchinson* order.

24. The orders required that DDS and MRC develop and implement an extensive information, outreach and informed choice process, since for people with IDD or ABI, there was little information that was proactively provided to people in nursing facilities about services and supports available in the community. DDS developed a comprehensive and effective informed choice process that included outings to community programs, meeting with provider staff, receiving some services out of the facility during the day, and meeting individuals with IDD who formerly lived in nursing facilities and/or their families to discuss the opportunities and experiences of people who had successfully transitioned to the community. In addition, there was an informed consent process directed by the DDS Area Office leadership to help inform people of their choice.

25. Importantly, there was a reorientation of service coordinators and other Area Office staff about the requirements of Title II of the ADA, the information and opportunities that should be afforded to waiver participation, and values training to Area Office staff about the importance and opportunities available to service recipients in the community. These actions evolved slowly at first, but soon became standard practices, and were critical in maintaining the placement targets set each year by DDS.

26. Similar efforts were taken pursuant to the *Hutchinson* orders. Particularly relevant was the dearth of applicants to the ABI-RS waiver. EOHHS initially claimed that there was not enough demand by people with ABI to fill available slots in the ABI-RS waiver. After an initial reluctance, EOHHS, DDS, and MRC developed a robust In-Reach and Out-Reach

program which demonstrated that there were, in fact, a large number of people with ABI in nursing facilities who wanted to move into the community. This demand then was sufficient to fill the available intensive residential waiver slots in the ABI-RS waiver.

27. There was a shared expectation that all state agency staff involved in implementing the *Hutchinson* order, including MRC and DDS, use every opportunity when in a nursing facility to find and inform residents about the opportunities for placement provided by the waivers and encourage people to apply who may be eligible. The DDS/MRC designed process of Outreach, In-Reach and provision of information to enable an informed choice was used for ABI clients and was again an effective strategy to comply with these orders.

      (6)    Each court order required the provision of case management/service coordination/transition coordinators.

28. Coordination of services is always a key component to transition people from institutional settings into the community and for successful service delivery in the community. There were no transition coordination functions or effective case management services offered to institutionalized individuals until incorporated into the *Rolland* and *Hutchinson* orders. This was critical to ensure successful service planning at initial placement and successful community living. The staff associated with these functions increased as the number of individuals placed increased each fiscal year.

29. Successful transition to the community requires services provided by case management/service coordination and transition services staff. These services were incorporated in the *Rolland* and *Hutchinson* orders. The transition coordination function ensured that the provider knows the individual's needs, such as personal preferences, the best ways to communicate with the individual, bringing family and friends into planning for the eventual move from the facility, checking that furniture, clothing, and favorite possessions were moving

with the person, and ensuring that medical information, including a primary care physician and an adequate supply of prescribed medications, were provided at the time of the move.  Case managers/service coordinators were assigned to each person to make sure that the individual's support team was familiar at the time of the move with the goals and objectives in the person's ISP, as well as how to implement behavioral programs and medical protocols.  These essential staff functions were detailed in each remedial order and incorporated in the waiver descriptions approved by CMS.  Their role also included monitoring services, supports and the well-being of the individual as a safeguard to ensure the delivery of quality services.

> (7)   The *Rolland* order required EOHHS to develop and provide a <u>significantly expanded array of specialized services.</u>

30.   The *Rolland* order also addressed specialized services provided within a nursing facility for residents with IDD.  The delivery of specialized services had to be individualized, had to augment services provided by the nursing facility, and had to ensure that the individual was provided with active treatment, as defined by federal law.  DDS, with the approval of EOHHS, developed several specialized services that were provided outside of the nursing facility and in a manner that encouraged community activities, as long as they were not a duplication of nursing facility services.

31.   Through the DDS PASRR Level II review, there were a number of people who were reviewed and recommended for brief stays every 90 days in the nursing facility.  If they stayed longer than 180 days, they were required to have specialized services, which for people with IDD are services necessary to prevent a regression of skills for the person remaining in the facility and, hopefully, the acquisition of skills that may benefit the person's ability to live more successfully in the community when they are discharged.  A Rolland Integrated Service Plan (RISP) was developed, driven by an assessment of the individual's functioning level, skills and

abilities on a range of personal competencies such as personal care, behavior management needs, maintenance and improvement of gross and fine motor skills, and development of appropriate interpersonal interactions. Since, to encourage maintenance and development of skills, some of these services may be provided outside a nursing facility, the federal PASRR regulations require that the State entity (in *Rolland,* DDS) provide services and supports within or outside the facility. These services are treatment modalities provided through different types of provider community programs such as day services, independent living services, recreational services or possibly transition services. Regardless of the type of community program, these treatment modalities must align with the goals and objectives contained in the RISP and must be provided continuously, intensively, and be of adequate duration to be sure the needs of the individual, as reflected in the RISP, are being addressed. In order to meet the federal active treatment standard, EOHHS allowed providers to bill for the needed treatment modalities as long as they were not duplicating services provided in a nursing facility. This exception allowed DDS to meet all federal PASRR requirements and continues to be used as a means of achieving active treatment for individuals remaining in nursing facilities for over 180 days.

32. In my opinion, the modifications to the programs, policies, procedures, and practices of EOHHS, DDS, and MRC were reasonable and necessary to implement the remedial orders in *Rolland* and *Hutchinson.* Moreover, they were critical in ensuring that thousands of people with IDD and ABI were offered meaningful opportunities to transition from nursing facilities to the community. Finally, these reasonable modifications of agency practices resulted in full compliance with those orders, and the successful dismissal of both of these cases.

14

Signed under the pains and penalties of perjury this 20th day of August, 2023.

*/s/ Randall Webster*
Randall Webster

## Comparison of MFP-RES Waiver to the DDS Intensive Support Waiver

| Waiver | MFP-RES | IDD-Intensive Supports Waiver |
|---|---|---|
| Eligibility for Non-LTSS agency services required for Waiver Participation | None | To be eligible for DDS services the individual must be domiciled in Massachusetts, be 22 or older and, have a confirmed intellectual disability which includes a significantly sub-average intellect functioning concurrently with and related to significant limitations in adaptive functioning which originates |
| Age | At least 22 years old, and if younger than 65, totally and permanently disabled | At least 22 years old, and if younger than 65, totally and permanently disabled |
| Applicant "Residential" Setting | Receiving inpatient services in a Nursing Facility, chronic disease or rehabilitation hospital or psychiatric hospital for a continuous time period of at least 90 days, excluding "rehabilitations days" | Receiving inpatient services in a Nursing Facility, chronic disease or rehabilitation hospital or psychiatric hospital but may also have been living in their own home, with their family or less than 24-hour individual support settings such as their own apartment with friends or even on their own. |
| Clinical Criteria | The individual is assessed by the Mass Waiver Unit to need residential habilitation services, assisted living or shared living 24 hour support services within the terms of the waiver; be "able to be safely served in the community" within the terms of the waiver. | Assessed to need one or more of the services provided under the waiver which includes 24-hour per day supervision or support in a supervised residential setting or family home |
| Risk Criteria | Risk Assessment document is incorporated into the UMass Clinical Review Team with documentation and recommendations provided by the Reviewing RN. Any of the 10 factors reviewed may be deemed to indicate that the individual cannot be safely served in the community and be a major determinative factor in the decision finding the applicant ineligible for the MFP waiver | DDS eligibility is the determinative factor for Waiver eligibility/enrollment. When a DDS eligible service recipient applies for any of the three DDS three waivers, an assessment, called the Massachusetts Comprehensive Assessment Profile (MASSCAP), is conducted to evaluate the individual's needs and capabilities along with strengths and needs of caregivers. Indications for risk factors are identified as part of the process helping the Team create an appropriate Individual Service Plan for the individual within the terms of the waiver. Through this process there is no waiver ineligibility determination made but rather an adjustment, modification, or accommodation to the |
| Financial Considerations | Has MassHealth benefits for inpatient services and be financially MassHealth eligible at least the day before discharge from the inpatient facility | Eligible for MassHealth benefits |

1

**Attachment A**